**EXEL TRANSPORTATION SER-VICES, INC.; Rick Sipkoi; and Sip–Code Logistics, Inc., Appellants,**

v.

**AIM HIGH LOGISTICS SERVICES, LLC, Appellee.**

No. 05–09–00154–CV.

Court of Appeals of Texas, Dallas.

June 14, 2010.

Rehearing Overruled Aug. 19, 2010.

Cynthia Keely Timms, Locke, Liddell & Sapp, L.L.P., Timothy R. George, Brian D. Garner, James Johnson, Fee Smith Sharp & Vitullo, L.L.P., Dallas, TX, for Appellants.

Craig A. Albert, Cherry Petersen Landry Albert LLP, Dallas, TX, for Appellee.

Before Justices MOSELEY, FITZGERALD, and LANG.

## OPINION

Opinion By Justice LANG.

Appellee Aim High Logistics Services, LLC ("Aim High") sued appellants Exel Transportation Services, Inc. ("Exel"), Rick Sipkoi ("Sipkoi"), and Sip–Code Logistics, Inc. ("Sip–Code") (collectively, "appellants") for breach of contract and tortious interference with a contract. Following a jury trial, Aim High was awarded $367,500 in damages and $300,000 in attorney's fees against Exel and $232,500 in damages against Sipkoi and Sip–Code.

In issues common to all appellants, they contend (1) the evidence is legally and

factually insufficient to support the jury's damage award and, alternatively, (2) the trial court erred by awarding Aim High a "double recovery." Additionally, Exel asserts (1) the evidence is legally and factually insufficient to support the jury's finding that Exel breached a contract with Aim High and (2) the trial court erred by combining four theories of contractual breach into a single liability question and a single damages question. Finally, in addition to the common issues described above, Sipkoi and Sip–Code argue (1) the trial court erred in entering a judgment against them for tortious interference with a contract because they were privileged to compete for customer accounts and entitled to rely on Exel's decision in any dispute and because the evidence was legally insufficient to support the jury's finding that certain documents at issue constituted a contract, and (2) the evidence was legally and factually insufficient to support the jury's finding that Sipkoi, individually, tortiously interfered with an agreement between Aim High and Exel.

Based on the analysis below, we conclude the evidence is legally insufficient to support the jury's damage award. We reverse the trial court's award of damages and attorney's fees to Aim High and render judgment that Aim High take nothing on its claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Exel is a "third-party logistics company" that "acts as a transportation department" for other companies. Sipkoi was a regional vice president of Exel until he left Exel in the fall of 2006. Then, Sipkoi formed Sip–Code, which, like Aim High, operates as a transportation logistics independent contractor of Exel.

Representatives of Exel and Aim High signed a "Sales and Independent Contrac-

tor Operations Agreement" (the "sales agreement"), which was nonexclusive as to both parties. Pursuant to the sales agreement, Exel engaged Aim High to perform sales and service functions on behalf of Exel. Such services were to include, but were not limited to, "invoicing, assistance in collection of freight charges, fleet management, customer service and tracing, warehousing, arranging for transportation, routing of freight, logistics consulting, and supply chain management." Aim High was to "promptly invoice the customer for all shipments" and "direct customers to make all payments directly to [Exel]," which would collect all amounts paid on such invoices and remit "sales commissions" and "operations commissions" to Aim High in accordance with specified terms of the agreement. Further, the sales agreement provided that "[b]efore calling on any customer, [Aim High] shall first obtain account clearance from management of [Exel] including confirmation that the customer has not already been assigned to or cleared for another Independent Contractor or sales representative of [Exel]." The record shows an identical agreement was entered into by representatives of Exel and Sip–Code.

According to the record, an "important" aspect of Exel's dealings with its independent contractors like Aim High and Sip–Code was to "protect the agents with their relationships" with customers and prevent "one agent undercutting another agent from a price standpoint and from anything to confuse the customer." Accordingly, in addition to provisions in its sales agreement, Exel initiated "account clearance" procedures and policies that generally provided a means to avoid any such "undercutting" and resolve disputes. These policies and procedures were set out in two documents that were separate from the sales agreement and were entitled "Ac-

count Clearance Procedure" (the "account procedure") and "Account Clearance Policy" (the "account policy"). The account procedure specified steps to be followed respecting account clearance and stated, "Also attached is the Account Clearance Policy, which each salesperson has signed and is on file at ETS Dallas." The account policy provided in relevant part that "[b]efore a sales call is made on any shipper, the salesperson must contact the account clearance staff in Dallas to determine if the shipper is an existing customer." Further, sections three and four of the account policy provided

3. Upon refusal by an existing salesperson to grant clearance, the potential salesperson may appeal to corporate for clearance. Conflicts will generally be resolved using the following guidelines:

   i. If the existing salesperson is not moving freight and potential salesperson has a contact but no current business, the potential salesperson will not be allowed to contact an account for 90 days from the date of the last correspondence or until existing salesperson authorizes contact, which ever comes first.

   ii. If the potential salesperson has a proven track record of significant business with the shipper under another company, they may be given 60 days to bring the business to [Exel].

   iii. If an existing [Exel] salesperson has lost the business or the business has become inexplicably dormant, they will be granted 60 days to recover the business be-

fore the potential salesperson is given authorization by corporate.

4. In all instances of conflict, corporate management will, after consideration of all facts and circumstances, have final say in resolving the conflict and his decision must be honored. Salespeople who do not follow this policy are subject to disciplinary actions to be determined by Corporate management.

In its third amended original petition, the live petition at the time of trial, Aim High asserted claims for breach of contract and fraudulent inducement [1] against Exel and for tortious interference with contract against Sipkoi and Sip–Code. Aim High alleged in relevant part that "[d]espite [Aim High's] outstanding performance during its time as a contractor with Defendant Exel, Defendant Exel has chosen to play favorites and has allowed at least one of its other agents, Defendant Sipkoi, a former corporate Exel employee, and Sipkoi's agency, Sip–Code, to circumvent the [account policy and account procedure] altogether and steal [Aim High's] customers." Specifically, Aim High asserted that Exel, Sipkoi, and Sip–Code had "taken the Yamaha account away from [Aim High]" without first clearing the account as required by the sales agreement and account policy. Further, Aim High alleged Exel had ignored the requirements of section three of the account policy as to the Funai, Del Monte, and Electrolux accounts, on which Aim High was the "existing salesperson," and authorized other Exel agents to develop that business.

In relevant part, Exel denied breach of any contract with Aim High. Sipkoi and Sip–Code asserted Aim High's claims were

---

**1.** Aim High's fraudulent inducement claim against Exel was nonsuited during trial and is

not at issue in this appeal.

barred by the doctrines of privilege and justification.

In a second amended response to Exel's request for disclosure of "[t]he amount and any method of calculating economic damages," Aim High stated it was seeking "actual damages, in the form of lost profits, for loss of the Yamaha Motor Corporation, Del Monte, Funai, and Electrolux accounts in an amount not to exceed $6,607,000.00." Prior to trial, appellants filed motions to strike Aim High's damages expert, E.J. Janik, and preclude Janik from offering damages testimony at trial. Specifically, appellants alleged in part

All three of Mr. Janik's damage models fail to account for the fact that [Aim High] lost the Big Lots account—[Aim High's] largest account—in late 2006. Big Lots accounted for over $5,360,000 of Plaintiff's revenue in 2006. This amount contributed over sixty-percent of [Aim High's] total 2006 revenue. Mr. Janik's analysis under all three of his damage models, however, fails to account for this substantial loss. Instead, Mr. Janik unbelievably attributes all lost profits between 2006 and 2007 to the Defendants' actions in connection with, *inter alia*, the Yamaha account, which contributed less than four-percent to [Aim High's] 2006 revenue.

(citation to exhibits omitted). According to appellants' motions, Janik's damage report regarding lost profits "overlooks [Aim High's] own significant losses suffered at the end of 2006—losses that the Defendants are not responsible for—and attributes all such loss to the Defendants."

In a response to appellants' motions, Aim High asserted that appellants' criticism "go[es] to the weight that should be given to Mr. Janik's testimony, not whether his testimony is admissible." Further, Aim High argued, in part, that "because Plaintiff does not concede that the loss of the Big Lots account was not the result of wrongful conduct by Defendants, it is appropriate for Mr. Janik to include the Big Lots account in his lost profits analysis." Additionally, Aim High contended that "[e]ven if the loss of Big Lots is somehow 'out of the ring,'" Texas law (1) provides that lost profit calculations do not have to include an itemization by customer as long as they are based upon objective facts, figures, and data and (2) gives juries discretion to award damages within the range of evidence presented at trial.

Prior to jury selection, the trial court held a hearing on appellants' motions challenging the admissibility of Janik's testimony. During that hearing, Janik testified on cross-examination that the figures in his three damage models are "company-wide" figures. Additionally, the following exchange occurred during cross-examination:

Q. All right. I'm correct in understanding you have not made any attempt to calculate lost profits as it pertains to particular accounts handled by Aim High, correct?

A. That's correct.

Q. And so, in this instance, you would not be able to assist the jury in providing us with numbers that Aim High allegedly lost as a result of a single account?

A. Either lost or gained for a single account, no.

At the conclusion of that hearing, the trial court stated to appellants' counsel, "I agree with you they just gave an overall number, but they provided historic numbers on each of the different accounts, and I'm sure Exel has even further back if they want to use them. So I do think you can kind of divide it out." The trial court denied appellants' motions challenging the admissibility of Janik's testimony.

During trial, evidence was presented relating to the alleged wrongful actions of appellants regarding the four accounts identified in the petition. Additionally, Carl Barata, a co-owner of Aim High, testified on cross-examination that the customers Aim High serves typically have no contracts with Exel or Aim High and can take their business elsewhere if they so choose. Barata acknowledged that Aim High had approximately thirty-six customers in 2006, and nineteen of those were no longer customers of Aim High in 2007. Further, Barata acknowledged that the accounts lost by Aim High during 2006 included the Big Lots account, which was Aim High's only account to date for which total annual sales exceeded one million dollars.

Sipkoi testified in relevant part that his Exel commissions from the Yamaha account during 2007 and early 2008 totaled approximately $145,000. An Exel document identified in the record as "Yamaha Spreadsheet," which had been admitted into evidence at the start of trial, corroborated Sipkoi's testimony as to his Yamaha commissions.

Dennis Muoio, another co-owner of Aim High, testified in part that before the accounts at issue were "wrestled away" from Aim High or otherwise disrupted, he had expected to handle 524 loads per month for Del Monte, 138,000 loads per year for Electrolux, and 70 to 80 loads per month for Funai. Further, Muoio testified as follows as to the effect of appellants' alleged actions on Aim High's "carrier network":

Q. So when Exel turned the spigot to shut off the Yamaha account, the Menlo/Electrolux account, the Del Monte account, and the Funai account in part, what effect did that have on your carrier network?

A. Oh, it's huge. It starts disrupting the network, because when you have carriers moving in directions for you and you start pulling accounts out, or into the pipelines of the accounts we were talking about, it starts damaging everything you put into place.

Over renewed objections by appellants, Janik testified at trial regarding his three damage models. Under "Model One," the "no-growth model," Janik calculated Aim High's lost profits by subtracting Aim High's 2007 gross income from its 2006 gross income, reducing that difference by five percent for "estimated variable costs," then extrapolating that loss into the future and discounting it to present value. The resulting lost profits under Model One ranged from $844,643 to $995,366, depending on the discount rate applied. Under "Model Two" and "Model Three," Janik used Aim High's actual profits in 2006 and 2007, Aim High's own five-year business plan, Exel's budgets for Aim High, and rate proposals by Aim High to various shippers to calculate lost profits. Resulting losses under Model Two, the "blended" model, ranged from $1,440,000 to $3,672,000, and losses under Model Three, the "high-growth" model, ranged from $1,676,000 to $5,145,000.

On cross-examination, Janik acknowledged that in 2006, approximately 66% of Aim High's revenue came from the Big Lots account and approximately 3.9% of Aim High's revenue came from the Yamaha account. With respect to the loss of the Big Lots account, Janik stated, "I saw ... that there were other proposals out there that would have mitigated or taken its place." He testified that the lost profit amounts calculated under each of his three damage models were "company-wide numbers." Additionally, Janik testified as follows:

Q. Now, I also want to be clear on something else ... These models, Model Two, Model Three, Model One, in none of these models have you tried to do a per customer identification or I think you called it a customer build-up, correct?

A. I did not do a specific customer pricing or build-up, no.

Q. So, and I want to make sure you and I are on the same page. None of these numbers that we see in your models are intended by you to say this is damage, for example, done by the loss of Yamaha, correct?

A. I agree with that.

Q. And likewise, none of these numbers is intended by you to indicate loss of the other accounts complained of, Menlo/Electrolux, Funai, or Del Monte, correct?

A. I want to be careful. I mean, I know those are the four accounts that [Aim High] has—has claimed, so for me to say it's not, that would be—that would be inconsistent with the assumptions. But I didn't individually put a price tag by year for each of the four customers. So for me to say it's no, I, I didn't individually price tag it, no. Because you'd have to know the revenues, you'd have to know the cost, the cost structures and everything else to get to gross income number.

Dr. William Choi testified he had been retained by appellants to evaluate Janik's analysis. Choi stated that Janik "ignored a number of real world facts that should have been incorporated under a proper damages methodology," including Aim High's loss of the Big Lots account in 2006. Choi testified in part that "[w]hat [Janik] has failed to do, and what he is required to do, is he must consider other evidence that would—that could potentially cause the difference to occur that's outside of the four accounts at issue." On cross-examination, Choi acknowledged that a lost profits analysis does not have to include a "customer-by-customer identification." However, Choi testified, under the generally accepted accounting principals relied upon by Janik, "you have to consider relevant factual evidence that could change the financial performance outside of the four accounts."

The trial court's charge submitted to the jury contained eight questions. The jury found in relevant part (1) an agreement existed between Aim High and Exel, (2) Exel failed to comply with that agreement, (3) the lost profits that resulted from Exel's breach of that agreement consisted of $91,875 in past profits and $275,625 in future profits, (4) a "reasonably recoverable" fee for the necessary services of Aim High's attorneys with respect to Aim High's breach of contract claim is $410,000 for preparation and trial, $50,000 for an appeal to the court of appeals, and $35,000 for an appeal to the supreme court of Texas, (5) Sipkoi and Sip–Code intentionally interfered with the agreement between Aim High and Exel, and (6) "in relation to the Yamaha and Menlo/Electrolux accounts," the lost profits Aim High would have earned as a result of its agreement with Exel, but for the interference of Sipkoi and Sip–Code, consist of $64,375 in past lost profits and $168,125 in future lost profits. The trial court rendered judgment against appellants on November 18, 2008, awarding Aim High (1) $367,500 in damages against Exel; (2) $232,500 in damages against Sipkoi and Sip–Code; (3) costs, prejudgment interest, and post-judgment interest; and (4) $410,000 in attorney's fees against Exel, plus additional attorney's fees of $50,000 and $35,000 in

the event of appeals to the court of appeals and supreme court, respectively.

Appellants filed various post-judgment motions, including motions for new trial, motions for judgment notwithstanding the verdict and to disregard certain findings, and a motion by Sipkoi and Sip–Code to modify the judgment. Exel contended in relevant part there is no evidence (1) that Aim High suffered $91,875 in past lost profits or $275,625 in future lost profits; (2) that damages found by the jury in response to question number three of the charge of the court were net lost profits suffered by Aim High versus gross revenues; (3) of net lost profits as to Aim High; (4) of the relationship between the damages awarded by the jury and the purported actions of Exel; or (5) that the actions of Exel caused the damages awarded by the jury. In response, Aim High asserted in part that "the jury's exercise of discretion in weighing the evidence to arrive at a damage amount that was within the available range is appropriate under Texas law." In a reply in support of its post-judgment motions, Exel argued that "Janik did not take into account that Aim High had no long-term contracts with any of its customers, nor did Janik consider that Aim High had lost its largest customer (producing over 65% of its revenues) through no fault of Exel, nor did Janik consider that Aim High had a history of losing 60%+ of the customers it was servicing on a yearly basis." After a hearing, appellants' post-judgment motions were denied by the trial court.

On March 3, 2009, the trial judge signed an "Order on Plaintiff's Voluntary Remittitur," in which the attorney's fee award to Aim High was "remitted from $410,000 (exclusive of fees for an appeal to the Texas Court of Appeals and Texas Supreme Court, if necessary) to $300,000." This appeal timely followed.

## II. SUFFICIENCY OF EVIDENCE AS TO LOST PROFIT DAMAGES

We begin with appellants' issues challenging the sufficiency of the evidence as to damages. In its second issue, Exel contends, in relevant part, that the evidence of damages is not legally or factually sufficient because there is "no evidence of a causal relationship between the supposed damages and the particular four alleged breaches, and the damages evidence is not reasonably certain, is speculative, and lacks objectivity." Sipkoi and Sip–Code assert in their third issue that "[t]he evidence was legally and factually insufficient to support the jury's damage award in this cause." According to Sipkoi and Sip–Code, "[Aim High] *never* provided the jury with a lost profits calculation directed solely to the accounts at issue in this case, and *never* provided the jury with an amount or method by which they could calculate the lost profits which were ultimately awarded." (emphasis original).

Aim High responds, in relevant part,

Texas law does not require a particular customer identification formula for proving lost profits; rather, lost profit opinions need only be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. What's more, a jury has the discretion to award damages within the range of evidence presented at trial. Aim High's principals, Carl Barata and Dennis Muoio, as well as Aim High's damage expert, EJ Janik, presented sufficient testimony for the jury to calculate lost profits with reasonable certainty.

### A. Standard of Review

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not

have the burden of proof, it must demonstrate that no evidence supports the finding. *See Private Mini Storage Realty, L.P. v. Larry F. Smith, Inc.*, 304 S.W.3d 854, 860 (Tex.App.-Dallas 2010, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983); *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 811 (Tex.App.-Dallas 2009, no pet.)); *see also Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 206 (Tex.App.-Fort Worth 2004, pet. denied). We review the evidence presented at trial in the light most favorable to the jury's verdict, crediting evidence favorable to that party if reasonable jurors could and disregarding evidence unless reasonable jurors could not. *See Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex.2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005); *Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 11 (Tex. App.-Dallas 2007, pet. denied). Anything more than a "scintilla of evidence" is legally sufficient to support the jury's finding. *See Cerullo v. Gottlieb*, 309 S.W.3d 160, 165–66 (Tex.App.-Dallas 2010, no pet.) (citing *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996)). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See id.* at 166 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)). In conducting our review, we are mindful that the jury, as factfinder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819; *Private Mini Storage Realty, L.P.*, 304 S.W.3d at 860. We may not substitute our judgment for the fact-finder's, even if we would reach a different answer on the evidence. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998); *Private Mini Storage Realty, L.P.*, 304 S.W.3d at 860.

## B. Applicable Law

■ Lost profits are damages for the loss of net income to a business. *Mood*, 245 S.W.3d at 12 (citing *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex.2002)). The rule concerning adequate evidence of lost profit damages has been stated by the Texas Supreme Court as follows:

> Recovery of lost profits does not require that the loss be susceptible to exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. Recovery of lost profits must be based on one complete calculation.

*Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994) (citations omitted).

■ The correct measure of damages for loss of profits is net profits. *See Holt Atherton Indus. v. Heine*, 835 S.W.2d 80, 83 n. 1 (Tex.1992). "Net profits" are defined as "what remains in the conduct of business after deducting from its total receipts all of the expenses incurred in carrying on the business." *See Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 456 (Tex.App.-Dallas 1988), *writ denied per curiam*, 778 S.W.2d 865 (Tex.1989). "[W]hen the evidence supports a range of awards, an award of damages within that range may be an appropriate exercise of the jury's discretion." *Hani v. Jimenez*, 264 S.W.3d 881, 888 (Tex.App.-Dallas 2008, pet. denied).

### C. Application of Law to Facts

Aim High contends that "[r]ather than requiring a particular 'customer identification' formula for proving lost profits, the Texas courts have emphasized the requirement that lost profit opinions 'be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.'" (citing *Ishin Speed Sport, Inc. v. Rutherford*, 933 S.W.2d 343, 350–51 (Tex.App.-Fort Worth 1996, no writ); *Sw. Recreational Indus. v. Field-Turf*, No. 01–50073, 2002 WL 32783971, at *4–*5 (5th Cir. Aug. 13, 2002)). However, neither of the two cases cited by Aim High as authority for its position are applicable here. The *Ishin* case involved acts that completely prevented operation of the plaintiff's business. *Ishin Speed Sport, Inc.*, 933 S.W.2d at 347 (breach prevented opening of driving school). Yet, Aim High does not contend, and no evidence shows, the acts of appellants completely prevented the operation of Aim High. The second case cited by Aim High involved a plaintiff that lost sales to twenty-nine prospective customers as a result of the defendant's actions. *Sw. Recreational Indus.*, 2002 WL 32783971, at *5. That plaintiff testified to the average price of its product and the typical profit margin on such sales, which was sufficient to uphold the damage award. *Id.* However, the record in this case is devoid of testimony regarding profit margins on the specific accounts lost as a result of the acts alleged. *See id.* Therefore, *Sw. Recreational Indus.* is also distinguishable.

Appellants argue the *Szczepanik* case has similar facts and is persuasive. *See* 883 S.W.2d at 648. In *Szczepanik*, First Southern Trust Company ("FST"), which managed retirement accounts, counterclaimed for lost profits in an action originally brought by a former employee who left FST in 1991 and took only certain identified customer accounts to a competing business. *Id.* at 649. FST offered damage evidence that it "managed assets of $350 million and expected to make a profit of $250,000 to $500,000 per year beginning in 1991." *Id.* The supreme court concluded such evidence was legally insufficient to show lost profits because, in part, "there is nothing in the record that relates the total amount of profits FST expected to make beginning in 1991 to the profits FST lost as a result of the transfer of retirement accounts to [the competing business]." *Id.* at 650.

The record shows Aim High's pleadings alleged wrongful acts of appellants as to four accounts: Yamaha, Funai, Del Monte, and Electrolux. In question number three of the charge of the court, the jury was asked what amount of lost profits "resulted from Exel's breach of the Agreement." In question number six of the charge, the jury was asked what amount of lost profits "Aim High would have earned as a result of the Agreement with Exel but for the interference" of Sipkoi and Sip–Code. Further, the jury was instructed that Aim High "is only seeking damages from Defendants Sipkoi and Sip–Code in relation to the Yamaha and Menlo/Electrolux accounts."

The record contains no allegation or evidence of wrongful conduct of appellants involving any account other than the four identified in Aim High's petition. However, Janik testified that his three damage models involved calculation of only "company-wide" lost profits. Additionally, Janik testified he did not "price tag" damage "done by the loss of" the four accounts at issue, individually. Aim High does not dispute that accounts lost by it during 2006 included the Big Lots account, which provided approximately 66% of Aim High's 2006 revenue and was Aim High's only account for which total annual sales ex-

ceeded one million dollars. Accordingly, on this record, we conclude that because the "company-wide" lost profits Janik calculated did not "relate" to the profits Aim High lost as a result of the acts alleged, Janik's testimony, alone, did not constitute reasonably certain evidence of Aim High's lost profits in this case. *See Szczepanik,* 883 S.W.2d at 650; *see also Atlas Copco Tools, Inc.,* 131 S.W.3d at 208–09 (failure of appellee's expert to establish lost profits with reasonable certainty was based in part on expert's improper inclusion of lost profits from customers appellee chose to relinquish and customers who refused to purchase products due to dissatisfaction with appellee's service).

Further, we cannot agree with Aim High that other evidence supports the damages in this case. Aim High asserts in its brief on appeal that Sipkoi earned approximately $145,000 in "net profit sales commissions" generated on the Yamaha account in 2007 and 2008. However, although the record contains one of Exel's documents identified as "Yamaha Spreadsheet" that lists a total of approximately $145,000 in payments by Exel to Sipkoi, there is no indication in the record that those payments, which Sipkoi referred to at trial as "commissions," constituted Sipkoi's "net profit." *See Turner,* 765 S.W.2d at 456 (net profits are "what remains in the conduct of business after deducting from its total receipts all of the expenses incurred in carrying on the business"). Additionally, Aim High asserts Muoio testified (1) he had expected to handle 524 loads per month for Del Monte, 138,000 loads per year for Electrolux, and 70 to 80 loads per month for Funai; and (2) loss of the four accounts at issue was "disrupting" to Aim High's carrier network. However, Muoio's testimony did not address Aim High's net profits. *See id.* A review of the record shows no evidence of net profits made by any independent contractor with

respect to any of the four accounts at issue, nor is there any evidence in the record from which such profits could be calculated. *See id.; see also Mood,* 245 S.W.3d at 11–12 (trial court did not err by disregarding jury's award of lost profits where there was no evidence from which jury could calculate lost profits as a result of actions alleged).

Finally, Aim High argues "the jury's exercise of discretion in weighing the evidence to arrive at a damage amount that was within or below the available range is appropriate under Texas law." According to Aim High, a jury has the discretion to award damages within or below "the range of evidence presented at trial." However, the rule more specifically stated by this Court is that "when the evidence supports a range of awards, an award of damages within that range may be an appropriate exercise of the jury's discretion." *Hani,* 264 S.W.3d at 888; *see also Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.,* 928 S.W.2d 100, 108 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (amount of damages below amount supported by evidence was appropriate where jury could have made reductions based on evidence). We concluded above that Janik's testimony did not constitute reasonably certain evidence of Aim High's lost profits in this case, and no other evidence in the record supported the lost profit damages at issue. Thus, because the evidence of the acts alleged as to the four specific accounts at issue did not "relate" to the company-wide lost profits calculations, an award of damages within the range of awards described by Janik was not "an appropriate exercise of the jury's discretion." *See Szczepanik,* 883 S.W.2d at 650; *Hani,* 264 S.W.3d at 888.

Based on foregoing analysis, we conclude the evidence of lost profit damages in this case is legally insufficient to sup-

port the jury's damage award. *See Szczepanik,* 883 S.W.2d at 650. We decide in favor of Exel on the portion of its second issue challenging the sufficiency of the evidence as to damages and in favor of Sipkoi and Sip–Code on their third issue. Further, because this is a situation "where no evidence establishes any amount of lost profit damages with reasonable certainty," a take-nothing judgment against Aim High is appropriate with respect to lost profit damages. *ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 880 (Tex.2010) (contrasting situation in which rendering of judgment is appropriate with situation in which "competent evidence exists to establish *some* reasonably certain amount of lost profits—just not the particular amount awarded by the trial court," which requires remittitur or remand); *see also MBM Fin. Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 666 (Tex.2009) (while remand for new trial is appropriate when there is "some evidence to support an amount of actual damages," rendering of judgment was proper when there was "no evidence about the amount of damages at all").

### III. ATTORNEY'S FEES

In the remaining portion of its second issue, Exel contends that "if there is no evidence of a breach of contract or proper damages, or if the case is reversed and remanded, then Aim High is no longer entitled to recover attorney's fees." Section 38.001(8) of the Texas Civil Practice and Remedies Code provides that a party "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE § 38.001(8) (Vernon 2008); *see also MBM Fin. Corp.,* 292 S.W.3d at 666. To recover attorney's fees under section 38.001(8), a party must (1) prevail on the cause of action for which attorney's fees are recoverable and (2) recover damages. *MBM Fin. Corp.,* 292 S.W.3d at 666; *see also Intercontinental Group P'ship v. KB Home Lone Star L.P.,* 295 S.W.3d 650, 651 (Tex.2009); *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997). Because we have concluded that Aim High is not entitled to lost profits, it has recovered no damages, precluding any award of attorney's fees. *See MBM Fin. Corp.,* 292 S.W.3d at 666; *Intercontinental Group P'ship,* 295 S.W.3d at 651; *Solis,* 951 S.W.2d at 390. Accordingly, we decide in favor of Exel on the portion of its second issue respecting attorney's fees.

### IV. CONCLUSION

Based on the record and the appropriate standard of review, we conclude the evidence in this case is legally insufficient to support the jury's damage award. Additionally, we conclude Aim High is not entitled to recovery of attorney's fees. We decide in favor of Exel on its second issue and in favor of Sipkoi and Sip–Code on their third issue. In light of the resolution of those issues, we need not address appellants' remaining issues.

We reverse the judgment of the trial court and render judgment that Aim High take nothing on its claims.