EXAMINATION MANAGEMENT
SERVICES, INC., Appellant,

v.

KERSH RISK MANAGEMENT, INC.
d/b/a Kersh Wellness, Appellee.

No. 05–10–00777–CV.

Court of Appeals of Texas,
Dallas.

April 27, 2012.

---

**2.** In light of our disposition of Connie's first issue, we need not address Connie's remaining issues.

John G. Browning, Ryan Grant Cole, Lewis, Brisbois, Bisgaard & Smith, LLP, Dallas, TX, Rosemarie Kanusky, Fulbright & Jaworski L.L.P., San Antonio, TX, for Appellant.

Michael A. Yanof, Thompson, Coe, Cousins, & Irons, L.L.P., Russell G. Thornton, Stinnett Thiebaud & Remington, L.L.P., C. Craig Tadlock, Tadlock Law Firm, PLLC, Dallas, TX, for Appellee.

Before Justices LANG, MURPHY, and MYERS.

## OPINION

Opinion By Justice MYERS.

Appellant, Examination Management Services, Inc. (EMSI), appeals a judgment granted in favor of appellee, Kersh Risk Management, Inc. d/b/a Kersh Wellness (Kersh). In four issues, EMSI argues (1) there is neither legally nor factually sufficient evidence to support the $156,996.05 of lost profits damages awarded by the jury; (2) there is neither legally nor factu-

ally sufficient evidence EMSI failed to comply with a material obligation of the contract; (3) there is neither legally nor factually sufficient evidence EMSI breached the contract first; and (4) the evidence established as a matter of law that Kersh wrongfully refused to pay EMSI $245,586.60. In a cross-issue, Kersh contends the trial court abused its discretion by awarding Kersh $80,000 in attorney's fees for its breach of contract claim because the evidence established reasonable and necessary attorney's fees of $124,809.80. For the following reasons, we reverse the award of lost profits and render judgment that Kersh take nothing.

## BACKGROUND AND PROCEDURAL HISTORY

EMSI is in the business of providing biometric testing services for corporate "wellness" programs. Wellness plans are incentive programs offered by companies to their employees to reduce insurance premiums, and often include biometric testing such as recording the medical history of participating employees, taking their body weight and blood pressure information, and testing the glucose and cholesterol levels of their blood. Those blood tests, in turn, typically involved a trained examiner drawing a drop of an employee's blood with a prick of the finger and placing the blood onto a "cassette," which was then placed in a machine that measured blood glucose and cholesterol. The cassettes were maintained in sealed packages that had a limited shelf life. Because of the limited shelf life, EMSI typically required customers to pay for all of the cassettes ordered for a particular wellness event, even if they were not actually used at the event.

In 2005, Kersh entered into agreements with various companies to provide wellness programs, and one of those companies was Envelopes Unlimited (EU). Another Kersh client, Bemis Company, Inc. (Bemis), was Kersh's largest account, comprising approximately seventy percent of its business. In May of 2005, Kersh subcontracted to use EMSI to perform biometric testing services, particularly with the Bemis wellness program. The two page agreement between Kersh and EMSI provided that, for cholesterol screenings, Kersh was to be charged "$25.00 per test." The agreement specified that "[t]ests are performed with fingerstick methodology, utilizing Cholestech LDX Analyzers."

EMSI started working for Kersh in the fall of 2005 and began billing Kersh in September of 2005. The relationship between the two parties, however, soon deteriorated. Kersh contended EMSI employees failed to "show up" at one Bemis work site, were late at others, lacked sufficient equipment to conduct the cholesterol tests, and were "unprofessional" in the way they conducted the tests because of a lack of proper training in how to use the testing equipment. Kersh also contended it was not being charged for tests actually "performed," as the contract required, and it was instead charged for every cassette ordered by EMSI, regardless of whether they were used. EMSI alleged Kersh was not paying its bills within thirty days as required under the contract, and that it was forced to "front" money to pay for cassettes and examiners it had used at Kersh's events.

Kersh was billed a total of $390,586.60 by EMSI, for the period of September of 2005 through April of 2006. In February of 2006, Kersh made its first payment to EMSI of $88,425.25. In May of that same year, Kersh made a $56,574.75 payment, for a total of $145,000 paid to EMSI.

EMSI attempted to collect $245,586.60 from Kersh in unpaid invoices, eventually referring the matter to a collection agency.

On April 5, 2007, Kersh sued EMSI for breach of contract, breach of express warranty, violation of the Texas Deceptive Trade Practices Act, and negligence. Kersh alleged EMSI's examiners were inadequately trained, were provided in insufficient numbers, used insufficient testing equipment, and that the testing equipment was improperly calibrated. EMSI counter-claimed for breach of contract. Shortly before the start of trial, Kersh nonsuited all its causes of action against EMSI other than breach of contract.

At trial, Kersh argued EMSI improperly charged it $101,550 for cassettes and that EMSI caused Kersh to lose $3.6 million in profits from EU and over $165,000 from Bemis. EMSI argued Kersh owed it $245,586.60 for unpaid invoices, after credits for payments. Kersh abandoned the portion of its lost profits claim that was based on EU; the trial court granted a partial directed verdict as to the EU claim. The jury was asked (1) whether EMSI breached the contract; (2) whether Kersh breached the contract; (3) who breached first; (4) if EMSI breached first, the damages Kersh sustained from (a) overcharges for cassettes and (b) lost profits; and (5) if Kersh breached first, the damages EMSI sustained from the loss of the "benefit of the bargain."[1]

The jury found both parties breached the contract and that EMSI breached first. In response to question four, the jury found "zero" damages on Kersh's claim that EMSI breached by overcharging for cassettes, and that Kersh lost profits in the amount of $156,996.05. As a result of the conditioning language in the charge, the jury did not answer question five regarding EMSI's damages for unpaid invoices, because it found EMSI breached the contract first. Both parties agreed before trial to submit the issue of attorney's fees for the prevailing party to the court following the jury verdict. The trial court awarded attorney's fees to Kersh but reduced Kersh's requested amount of attorney's fees from $124,809.80 to $80,000. Both parties filed notices of appeal.

## Discussion

### Lost Profits

In its first issue, EMSI alleges there is neither legally nor factually sufficient evidence to show Kersh sustained lost profits damages in the amount of $156,996.05, which is the amount found by the jury in response to question 4(b) of the charge.

When, as in this case, an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *See Exel Transp. Servs., Inc. v. Aim High Logistics Servs., LLC,* 323 S.W.3d 224, 232 (Tex.App.-Dallas, 2010, pet.denied); *Private Mini Storage Realty, L.P. v. Larry F. Smith, Inc.,* 304 S.W.3d 854, 860 (Tex.App.-Dallas 2010, no pet.) (citing *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983)). We review the evidence presented at trial in the light most favorable

---

1. The charge defined "[l]oss of benefit of the bargain" as

> the difference, if any, between the value of services scheduled by Kersh Risk Management, Inc. to be performed by Examination Management Services, Inc. and not timely cancelled pursuant to the Agreement, and the amount of money paid to Examination Management Services, Inc. by Kersh Risk Management, Inc.

to the jury's verdict, crediting evidence favorable to that party if reasonable jurors could and disregarding evidence unless reasonable jurors could not. *See Exel Transp. Services,* 323 S.W.3d at 232. Anything more than a "scintilla of evidence" is legally sufficient to support the jury's finding. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fairminded people to differ in their conclusions. *Id.* In conducting our review, we realize that the jury, as the fact finder, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005); *Exel Transp. Services,* 323 S.W.3d at 232; *Private Mini Storage Realty,* 304 S.W.3d at 860. We may not substitute our judgment for the fact finder's, even if we would have reached a different answer on the evidence. *See Exel Transp. Servs.,* 323 S.W.3d at 232.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Rusty's Weigh Scales and Serv., Inc. v. North Texas Scales, Inc.,* 314 S.W.3d 105, 109–110 (Tex. App.-El Paso 2010, no pet.). After considering and weighing all the evidence, we set aside the fact-finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176; *Rusty's Weigh Scales,* 314 S.W.3d at 110. We again note that the trier-of-fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and that we will not substitute our own judgment for the trier-of-fact's, even if we would have reached a different answer re-

garding the evidence. *Rusty's Weigh Scales,* 314 S.W.3d at 110.

■■■ The general rules regarding adequate evidence of lost profit damages are well known:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) (citations omitted); *see also ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 876 (Tex.2010) (citing *Holt Atherton*). The injured party must do more than show it suffered "some" lost profits. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 504 (Tex.2001). Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity. *Bowen v. Robinson,* 227 S.W.3d 86, 96 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). The calculation of lost profits must be based on net profits, not gross revenues. *Holt Atherton,* 835 S.W.2d at 83 n. 1; *Texaco, Inc. v. Phan,* 137 S.W.3d 763, 771 (Tex.App.-Houston 2004, no pet.).

■■ In this appeal, EMSI asserts Kersh presented no evidence from which the jury

could determine lost profits with any reasonable certainty. We agree. Kersh did not present any expert testimony regarding lost profits nor did it provide a damage model to the jury or otherwise inform the jury how it should determine lost profits, and our own review of the record does not reveal any objective facts, figures, or data from which lost profits could have been determined with reasonable certainty.

At trial, Kersh's lost profits calculation was partially based on its September 2005 contract with Bemis, which was valued at $2,065,739, and a second contract with Bemis in September 2006, which was valued at $1,900,480—a difference of $165,259. Kersh alleged that Bemis had demanded a ten percent "price break" because of its "testing experience going into year two," and the parties ultimately agreed to eight percent. The provisions of the two agreements, however, are not identical, and they contain some differences in overhead costs between the testing services that Kersh outsourced to EMSI in 2005 and performed itself in 2006. The 2006 agreement, for example, required Kersh to "[c]onduct a Fast Track program for new hires and new spouses." The 2005 agreement contained no such obligation. The 2005 agreement specified that Kersh was obligated to mail all eligible Bemis employees a "tri-fold" information brochure; the 2006 agreement indicated Kersh was obligated to "Provide a Program Overview Guide to all meeting attendees and mail to employees at remote locations." The 2006 agreement contained a service guarantee which specified that, if Kersh did not receive an 80% passing score on an attached "Account Manage-

ment Scorecard," Kersh would pay a penalty "of 1% of the quarterly fees" to Bemis. There was no such provision in the 2005 agreement.

In addition to the contracts, Kersh relied on testimony from its vice president of account management since 2005, Kimberly Ahbert.[2] She testified that the difference in pricing between the 2005 and 2006 Bemis contracts was "about $155,000," and that the "services" between the two contracts were "comparable." She did not know how much, if any, of the price difference between the two agreements represented any kind of lost profits to Kersh:

Q. [COUNSEL FOR EMSI:] You weren't involved in actively negotiating the terms of the 2006 contract between Kersh and BEMIS, were you?

A. [AHBERT:] I was on all conference calls and had many discussions, but I wasn't the active spokesperson on the calls when it came to negotiations.

Q. This 2005 contract with BEMIS that paid roughly $2 million in terms of gross revenue to Kersh, you don't know how much of that was profit to Kersh, do you?

A. No, I do not.

Q. The amount that you testified before roughly, I think you said $155,000 difference in the second year of the contract with BEMIS, 2006 contract, you don't know what, if any, amount of that revenue in the 2006 contract represents any kind of lost profit, do you?

A. No, I do not.

Kersh also relied on the testimony of its chief operating officer, Melbourne O'Bann-

2. In the reporter's record, the witness's name is spelled as "Ahbert." EMSI notes that Ahbert is the phonetic spelling of Hebert, which was the witness's actual name. We use the spelling found in the reporter's record.

ion, who testified regarding the two contracts and Kersh's relationship with Bemis. O'Bannion testified that he started working for Kersh in January of 2007, after the two Bemis contracts had been negotiated, and part of his job responsibilities included reviewing the two contracts with Bemis. He noted that, based on "the way that I read the contract," the relative performance costs or expenses between the two contracts were "very similar." The relevant portion of his testimony reads as follows:

> Q. [COUNSEL FOR KERSH:] You testified yesterday, Mr. O'Bannion, and we've heard lots of testimony about the pricing between the 2005 and 2006 BEMIS contract of $165,000, do you recall that testimony?
>
> A. [O'BANNION:] Yes, I do.
>
> Q. Okay. And we went through yesterday, well, to summarize, the differences we laid out were the services between 2005 and 2006 substantially similar?
>
> A. Yes, they were.
>
> Q. Was the cost associated with performing those services substantially similar between those two years?
>
> A. Very similar. On the 2006 year, the way that I read the contract, our expenses would have been slightly higher, if anything, than 2005 year.
>
> Q. Let's, for the sake of fairness, let's call them even and not spot that to Kersh. Is that fair?
>
> A. That's fair.
>
> Q. And when you say costs, or when we're talking about costs, would that be

the same thing as overhead for the two contracts?

> A. Yes.

O'Bannion did not testify regarding overhead attributable to the two contracts or otherwise specifically explain what costs were similar or whether they were fixed or variable, nor did he provide objective facts, figures or data to show either year's costs. He was asked about profit margin percentages, but did not answer the question because EMSI's counsel objected to the question based on Kersh's discovery responses.[3]

■ Kersh disagrees its proof of lost profits is legally insufficient, noting Texas law does not require "precise calculation" of damages. Although recovery for lost profits does not require that the loss be susceptible to exact calculation, the injured party must do more than show it suffered "some" lost profits. *Helena Chem. Co.,* 47 S.W.3d at 504 (citing *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994)). Texas law requires supporting facts, figures, or data. *Holt Atherton,* 835 S.W.2d at 84–85. In particular, the injured party must prove the amount of the loss by competent evidence with reasonable certainty. *Helena Chem. Co.,* 47 S.W.3d at 504 (citing *Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *Heine,* 835 S.W.2d at 84). "Reasonable certainty" is not shown when the profits claimed to be lost are largely speculative, as from an activity dependent on uncertain or changing market condition, on "chancy" business opportunities, or on promotion of untested products or entry into unknown markets

---

**3.** When Kersh's counsel posed the question, EMSI's counsel objected, arguing Kersh never responded to discovery requests regarding lost profits. The trial court discussed this matter during an off-the-record bench conference, after which O'Bannion was asked a different question.

or unproven enterprises. *Tex. Instruments, Inc.*, 877 S.W.2d at 279; *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 206–07 (Tex.App.-Fort Worth 2004, pet. denied). This determination is fact-intensive but, as noted earlier, opinions on lost profit estimates must, "at a minimum," be based on objective facts, figures, or data from which the lost profits amount may be ascertained. *Helena Chem. Co.*, 47 S.W.3d at 504 (citing *Szczepanik*, 883 S.W.2d at 649; *Holt Atherton*, 835 S.W.2d at 84).

Kersh cites cases where business owners testified concerning business economic damages or the market value of property converted from the business. *See, e.g., Helena Chem. Co.*, 47 S.W.3d at 505–06; *D/FW Commercial Roofing Co. v. Mehra*, 854 S.W.2d 182, 188 (Tex.App.-Dallas 1993, no writ); *Allied Bank West Loop, N.A. v. C.B.D. & Assocs., Inc.*, 728 S.W.2d 49, 54–55 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.); *see also Wiese v. Pro Am Services, Inc.*, 317 S.W.3d 857, 862–63 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (owner of company can testify to value of converted property and, absent controverting evidence, such testimony will sustain a verdict); *Burns v. Rochon*, 190 S.W.3d 263, 270–71 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (owner's uncontested testimony regarding value of his converted property will sustain a verdict); *Burlington N. R.R. v. General Projection Sys.*, No. 05–97–00425–CV, 2000 WL 1100874, at *8–10 (Tex.App.-Dallas August 8, 2000, pet. denied) (not designated for publication) (opinion on rehearing) (testimony by plaintiff's chief financial officer regarding converted property's rental value was legally and factually sufficient to support award of loss of use damages). The cases cited by Kersh, however, generally involve calculations of damages based on specific facts, figures, or data regarding lost profits, often supported by expert testimony or the testimony of the owner of the business. The situation in the present case is different.

O'Bannion testified that the costs or overhead between the two contracts were "very similar." But he based his testimony on "the way that I read the contract," and he did not enumerate costs or overhead in the two agreements or provide objective facts, figures, or data from which those costs or overhead could be determined with reasonable certainty. Furthermore, he did not testify as an expert on lost profits. O'Bannion's testimony is simply too speculative to establish lost profits with the required reasonable certainty. *See Szczepanik*, 883 S.W.2d at 649–50 (defendant's counterclaim for lost profits speculative when defendant's secretary and treasurer testified they expected to make a profit of $250,000 to $500,000 per year without any showing of how they determined the amount of lost profits). We also note that we have not found a case where evidence was found to be sufficient to support an award of lost profits damages based on a witness's contention that expenses between two contracts were "similar."

Kersh also argues the two contracts themselves constituted "objective evidence and data" that was "sufficient to establish net lost profits." But we find no support for the proposition that a price reduction between two contracts, absent supporting facts, figures, or data, is sufficient evidence of lost profits. *See Holt Atherton*, 835 S.W.2d at 85 ("the bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits"); *Allied Bank*, 728 S.W.2d at 54–55 ("In order to recover lost profits,

a party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty."). Moreover, the jury's award of $156,996.05 is $8,262.95 less than the $165,259 price differential between the two contracts, and we find no evidence in the record to account for the reduction.

 Arguing that the reduction was within the jury's discretion, Kersh cites *Mayberry v. Tex. Dept. of Agriculture*, 948 S.W.2d 312, 316–17 (Tex.App.-Austin 1997, writ denied), where the jury's damage award of $1,206 was upheld because the supporting evidence showed a range of damages of between $1,028 to $1,292. As a general rule, the jury has broad discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for its calculation. *Holland v. Lovelace*, 352 S.W.3d 777, 792 (Tex.App.-Dallas 2011, no pet.). The jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear, and the fact that there is nothing in the record to show how the jury arrived at a specific amount is not necessarily fatal to the verdict. *Id.* Instead, when the evidence supports a range of awards, an award of damages within that range may be an appropriate exercise of the jury's discretion. *Id.* But in this case, as discussed earlier, the evidence does not show Kersh offered the jury a range of lost profits damages, calculated with reasonable certainty, from which it could have exercised its discretion.

 After reviewing the evidence in the light most favorable to the jury's verdict, we therefore conclude Kersh failed to provide legally sufficient evidence from which lost profits could be determined with

reasonable certainty. "Lost profits must be non-speculative and corroborated." *Rusty's Weigh Scales*, 314 S.W.3d at 111. Because there was no reliable, non-speculative evidence on lost profits, we conclude the jury's finding that Kersh sustained lost profits damages of $156,996.05 is not supported by legally sufficient evidence. We decide in favor of EMSI on the portion of its first issue challenging the legal sufficiency of the evidence as to lost profits damages.

### Material Breach

In its second and third issues, EMSI challenges the legal and factual sufficiency of the evidence supporting the jury's findings (in question one of the charge) that it materially breached the contract, and (in question three) that it was the first to breach a material obligation of the contract.

 "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex.App.-Dallas 2005, pet. denied). "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex.2004). Whether a party's breach of contract is so material as to render the contract unenforceable is ordinarily a question of fact to be determined based on several factors, including:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be ade-

quately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* at 199 (citing Restatement (Second) of Contracts § 241 (1981)). Because we are dealing with dual findings that both parties breached the agreement, we must determine whether there is legally and factually sufficient evidence that EMSI materially breached the contract first. *See Casarez v. Alltec Constr. Co., Inc.,* No. 14–07–00068–CV, 2007 WL 3287933, at *4 (Tex. App.-Houston [14th Dist.] Nov. 6, 2007, no pet.) (mem. op., not designated for publication).

■ The evidence supports the jury's findings. Kersh alleged in its pleadings that EMSI materially breached the contract by either not performing the services and duties required under the contract or not performing them adequately. According to EMSI, Kersh materially breached the contract by failing to pay, in a timely manner, invoices sent pursuant to the contract.

Under the contract, payment was due within thirty days of the "date of invoice." The first invoice from EMSI to Kersh had a "Billing Period Date" of September 30, 2005. Each page of that first invoice also contained, at the bottom of every page, a "footer" date of October 3, 2005. But whether we use the "Billing Period Date" of September 30 or the date set out on the "footer" of the first invoice—October 3—as the "date of invoice" under the agreement of the parties, the first invoice would have been due to be paid not earlier than October 30 and no later than November 2, 2005.

Ahbert testified that, prior to performing any testing services at Bemis work sites, EMSI represented to Kersh its employees were already "fully trained." But Ahbert added that, at the first Bemis facility where EMSI began the testing services, in Mankato, Minnesota, on September 7 and 8, 2005, the EMSI employees were untrained, arrived late, "did not know how to use the equipment," and were "not professional." These problems continued over the next several weeks and did not improve, according to Ahbert's testimony. Ahbert described what occurred at the Bemis work site in Clinton, Iowa on September 27, 2005:

They were at the, I believe this was at the Clinton site where it just completely fell apart. They did not show to one of our largest sites. They were completely no shows. When they did show up they were completely unprofessional. They weren't trained. The equipment that they had brought wasn't enough. They were supposed to bring, I believe four to five Cholestech machines, and they only brought two of the printers.

Actually the individual that we had sent from our site, or from Kersh, they actually ended up having to be the ones that were helping to do the finger sticks, because the individuals that EMSI sent out were not trained to do the sticks.

It was—it became quickly a disaster. We lost participants, people who were signed up took their names off, took their names off the list, would not participate with us. We had to do a retest. It was a really bad testing event

Two days later, on September 29, Ahbert participated in a conference call between EMSI and Kersh, where these and other issues were discussed. The agenda notes for the conference call, which were prepared by Ahbert and admitted at trial, described various problems at Bemis work sites in Clinton, Iowa, Pauls Valley, Oklahoma, and Kansas City, Kansas; Ahbert made the following "overall" observations:

* Examiners are constantly arriving untrained and unfamiliar with our program and the use of the Cholestechs and Omrons [machines].

* Examiners are arriving late.

* Paperwork is coming back with incomplete data (missing b.f., b/p, etc.).

* Supplies are, in most cases, not arriving at the branches until the day before the event. Examiners are communicating to our leads that they have no idea where the equipment is.

* Kersh has had to supply Omrons [machines] and printers at multiple locations.

*—Obvious lack of communication between Dallas and branches, or branch leads and crew.

* EMSI has had this schedule since mid-July and there are still weekly staff and equipment issues.

The agenda notes also stated, "There is room for error next week and beyond. There is a 2.5 million dollar contract at stake. My Site Managers are threatening to walk out."

Asked how the untrained examiners affected the testing process, Ahbert testified:

It—it slows down the entire process. It makes the entire work process look un-professional. People will drop out because of word-of-mouth, because of the previous person that just went through testing. But it also slows down production time at BEMIS Company. Those individuals are coming off of their production line. We're telling them that they were only supposed to stay off of their production line for 10 to 15 minutes. During this testing individuals were off anywhere from 30 minutes to an hour, which slows down their production. They were having to pay people over time because of this event. Any individuals just were not trained on the machine itself. People were being double sticked on the finger sticks. Inaccurate readings were being given on blood pressure machines.

She added that the problems she described were not isolated issues or complaints, and "we were hearing this pretty much across the board" at other Bemis work sites. EMSI "[v]ery occasionally" handled the testing services well, but, according to Ahbert, complaints were the rule rather than the exception. Asked why, given EMSI's sub-standard performance, Kersh then continued using its testing services for the duration of the 2005 "testing period," which "ran from September all the way through October," Ahbert explained:

We had no other relationship built with any other testing company that we could just quickly switch to. We had a contract with BEMIS. We already had testing dates already scheduled. Individuals were already scheduled and had already scheduled this in their life, and already scheduled for this testing event.

All of our manpower, all of our resources were solely dedicated to handling this situation. We had no one who could just completely sit back and try to

find another vendor at this point. There was no time. There was no resources. And we had had a contract that we had to be able to uphold.

She also noted that the nature of the work at the Bemis facilities, which often involved "24 hour shifts" and individuals working "on two weeks, off two weeks," made it difficult to quickly change testing events, many of which were scheduled "all the way back from probably July 2005." All of EMSI's services at Bemis's facilities were completed by the end of October of 2005, and EMSI did not perform any services, other than "some make-up tests," at Bemis's facilities in November of that year.

Four EMSI employees testified at trial either live or by deposition. No witnesses, however, disputed Kersh's evidence of EMSI's performance of the testing services at Bemis's facilities during the testing period, which was from September 7 until October 28, 2005. This included EMSI's director of training and credentialing, Wendy Holcomb, who oversaw the Kersh account.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude the jury could have reasonably found EMSI breached the contract and that EMSI, not Kersh, was the first party to breach a material obligation of the contract, and the material breaches occurred prior to November 2, 2005. We further conclude the evidence supporting the jury's findings is not so weak as to render them clearly wrong and manifestly unjust. Therefore, the evidence is legally and factually sufficient to support the jury's find-

ings in questions one and three of the charge. We overrule EMSI's second and third issues.

### EMSI's Damages

In its fourth issue, EMSI contends the evidence establishes as a matter of law that Kersh wrongfully refused to pay EMSI $245,586.60. EMSI alleges that "[t]he jury did not have the opportunity to award EMSI damages for Kersh's uncontested breach, but damages should nonetheless be rendered in favor of EMSI."

The jury charge in this case first asked the jurors two competing breach of contract questions, then asked the jurors who breached the contract first. The jury was then asked damages questions. The two damages questions were preceded by conditioning instructions to only answer the question if the jury first found a breach, and also found the other party breached first. Thus, for question four of the charge, Kersh's damages question, the jury was told to answer only if it found EMSI materially breached the contract first. For question five, EMSI's damages question, the jury's response to that question was conditioned on the jury finding that Kersh materially breached the contract first.[4]

EMSI's argument in its fourth issue is related to its assertion in issues two and three that the evidence conclusively showed Kersh materially breached the contract first, not EMSI. The jury, however, found EMSI, not Kersh, materially breached the contract first. We have concluded the jury's findings are supported by legally and factually sufficient evidence.

---

4. During the charge conference, EMSI objected to question four based on a lack of evidence of lost profits, but it did not object to the conditioning language preceding the question, and it did not object to question five.

Furthermore, due to the conditioning language in the charge that preceded question five-to which EMSI did not object-the jury did not answer EMSI's damages question. EMSI has not shown it is entitled to recover any damages. *See, e.g., Mustang Pipeline Co.*, 134 S.W.3d at 196. We overrule EMSI's fourth issue.

### Conclusion

We reverse the trial court's judgment insofar as it awards damages to Kersh for lost profits. We render judgment that Kersh take nothing on its claim of lost profits. Because we have concluded Kersh is not entitled to lost profits, it has recovered no damages, thus precluding an award of attorney's fees. *See Exel Transportation Servs.*, 323 S.W.3d at 235. In addition, because we sustain EMSI's first issue and render a take-nothing judgment, we do not address the remaining issues. *See, e.g., CenterPoint Energy Houston Elec. LLC v. Bluebonnet Drive, Ltd.*, 264 S.W.3d 381, 392 (Tex.App.-Houston [1st Dist.] 2008, pet. denied).