Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# OPINION

No. 04-09-00392-CV

**TOTAL CLEAN, LLC**,
Appellant

v.

**COX SMITH MATTHEWS INCORPORATED**
f/k/a Cox & Smith Incorporated and Renee F. McElhaney,
Appellees

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CI-05718
Honorable Barbara Hanson Nellermoe, Judge Presiding

Opinion by:     Steven C. Hilbig, Justice
Concurring and Dissenting Opinion by:  Sandee Bryan Marion, Justice

Sitting:     Catherine Stone, Chief Justice
             Sandee Bryan Marion, Justice
             Steven C. Hilbig, Justice

Delivered and Filed:  October 20, 2010

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

Total Clean, LLC appeals the summary judgment rendered in favor of Cox Smith Matthews

Incorporated and Renee McElhaney.  We affirm the take-nothing judgment on Total Clean's

negligence, negligent misrepresentation, and fraud claims because Total Clean failed to present any

evidence of actual damages in response to the motion for summary judgment.  However, we reverse

the judgment on Total Clean's breach of fiduciary duty claim.

## BACKGROUND

The Nami family formed Total Clean in 2000 for the purpose of constructing and operating an automated commercial truck wash in San Antonio. To that end, Total Clean entered into a contract to purchase a truck wash system from ONDEO Nalco ("Nalco"). Unsatisfied with the work done by Nalco, Total Clean sued Nalco and sought to recover its lost profits from the venture. Total Clean hired Jon Powell as its attorney. Powell recommended Total Clean hire Renee McElhaney and Cox Smith Matthews Incorporated ("Cox Smith") to serve as co-counsel. A jury trial was set to commence on September 29, 2003, in federal court before United States District Judge Royal Furgeson. In pretrial filings, Total Clean's attorneys estimated trial would take from two to four weeks.

Shortly before the trial date, McElhaney attended an Inns of Court[1] meeting, which was also attended by Judge Furgeson. According to McElhaney, she had a brief conversation with the judge, during which he told her the parties would have only five days to try the case. As she left the Inns of Court meeting, McElhaney called Powell and relayed the comment to him. The next day, McElhaney met with Powell and Robert Nami, Sr., and reported the conversation to them. The litigants eventually settled the case for $4.5 million. The settlement proceeds allowed Total Clean to pay its attorney's fees, recoup its initial investment of approximately $2.378 million, and recover approximately $357,000, the amount it was seeking from Nalco for past lost profits.

The Namis later came to believe that Judge Furgeson had not told McElhaney he would limit trial to only five days, and that McElhaney had lied in order to induce the Nami family to settle the

---

[1] American Inns of Court are groups of judges and lawyers who gather for programs and discussions designed to foster excellence in professionalism, ethics, and legal skills. *See* http://www.innsofcourt.org.

case. Total Clean sued McElhaney and Cox Smith for breach of fiduciary duty, fraud, negligence (legal malpractice), and negligent misrepresentation. McElhaney and Cox Smith (hereinafter, collectively, "appellees") filed a combined motion for traditional summary judgment and a no-evidence summary judgment, asserting (1) there is no evidence McElhaney lied when she told Nami that Judge Furgeson told her the parties would be limited to five days to try the Nalco lawsuit; (2) Total Clean's claim for actual damages is not supported by competent evidence; and (3) there is no evidence of the standard of care, breach, or causation because Total Clean failed to designate liability experts. Total Clean responded, and appellees later filed objections to Total Clean's summary judgment evidence. After a hearing, the trial court sustained appellees' evidentiary objections and granted their motion for summary judgment. Total Clean appeals.

### EVIDENCE OF CONVERSATION WITH THE JUDGE

All of Total Clean's causes of action are premised on the contention that Judge Furgeson did not tell McElhaney the parties would be limited to five days to try the case. Appellees moved for summary judgment on the ground there was no evidence McElhaney lied to the Namis about her conversation with Judge Furgeson. To defeat the no-evidence motion for summary judgment, Total Clean was required to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *See Reynosa v. Huff*, 21 S.W.3d 510, 512 (Tex. App.—San Antonio 2000, no pet.). More than a scintilla of evidence exists when the evidence rises to a level that enables reasonable and fair-minded people to differ in their conclusions. *Id.* Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Id.* In deciding whether the summary judgment evidence raises a genuine issue of material fact, we review the entire record in the light most favorable to the respondent. *King Ranch, Inc. v. Chapman*,

118 S.W.3d 742, 750 (Tex. 2003). We view as true all evidence favorable to the respondent and indulge every reasonable inference and resolve all doubts in its favor. *Gonzales v. O'Brien*, 305 S.W.3d 186, 189 (Tex. App.—San Antonio 2009, no pet.); *Kelly v. Brown*, 260 S.W.3d 212, 216 (Tex. App.—Dallas 2008, pet. denied).

Appellees contend the trial court correctly applied the equal inference rule to grant summary judgment on this ground because it is equally consistent to infer from the evidence that the conversation occurred as McElhaney reported it or that it did not. Total Clean acknowledges there is no direct evidence supporting its contention that McElhaney did not truthfully relate her conversation with Judge Furgeson to the Namis. Instead, Total Clean relies on Judge Furgeson's deposition testimony, including the testimony of his habits and general practices, and the pretrial proceedings in the Nalco suit. Total Clean argues the equal inference rule does not apply and the trial court erred in granting summary judgment on this ground because the record as a whole contains sufficient circumstantial evidence to enable a reasonable juror to infer that the alleged conversation in which Judge Furgeson told McElhaney he would limit trial time did not occur. We agree with Total Clean.

Judge Furgeson was asked at his August 2008 deposition whether he could recall "deciding or entering an order or telling the lawyers in this case that [he] was going to limit them to five days of trial." The judge responded "I just don't have any recollection about that one way or another. I don't – I just don't recall." Later, when asked more specifically if he remembered telling McElhaney he was going to limit the trial to five days, he stated: "I don't have any recollection of having a discussion with Ms. McElhaney about the trial date. I just have no recollection. I'm not saying I – it is possible that I had a discussion with her, but I have no recollection of it."

Appellees assert this testimony amounts to nothing more than meager circumstantial evidence that would require the jury to improperly pick between two reasonable but equally probable inferences: that Judge Furgeson made the alleged statement to McElhaney but he could not recall doing so or that he did not make the statement. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997) (when circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred). This argument ignores the rest of the summary judgment record.

Total Clean filed the record of a June 2003 pretrial hearing held in the Nalco case. At that hearing, the attorneys told Judge Furgeson the case would take up to three weeks to try. The judge set the trial for September 29, 2003. Judge Furgeson told the lawyers that due to the anticipated length of the trial, they would probably select eight to ten jurors to allow for the loss of jurors due to illness or other reasons. Judge Furgeson did not give counsel any indication that the anticipated trial length presented any difficulties or that he intended to limit the trial.

The parties questioned Judge Furgeson at length during his deposition about his habits and practices in conducting trials and interacting with attorneys. When asked whether he recalled setting a limitation on the time of trial in this case, the judge responded "I don't recall doing it in this case. I normally don't set any limitations." When asked if it was his practice to tell the lawyers before trial he would limit them to a shorter time than requested, Judge Furgeson stated:

> It is important that parties have their day in court. And so I just make it a practice to work with the lawyers. I like lawyers. I respect lawyers. There are good lawyers practicing in my court, and my – my habit is not to be authoritarian with lawyers.

When asked if he ever sent a letter to the parties before trial and arbitrarily limited the time of trial, Judge Furgeson stated:

Well, let's say – you know, people never like to say never, and – and I may have in an instance or two limited lawyers. I can't recall when I've done it, but I may have done it a time or two. It's not my general practice. My view is that the courtroom is where the ultimate justice is done, and we have to work together to make sure both sides get heard fairly.

Judge Furgeson testified that he could recall setting a time limit before trial only once:

And I think – as far as I can remember, that's the – you know, I've tried lots of cases over the last 15 years. I think that's the only time I started with a clock.

He also testified that he imposed a time limit only after working with both sides in the lawsuit:

Q.     Judge in that case [where a time limit was imposed before trial] you didn't, in that case you worked with both lawyers on this clock issue, correct?

A.     Correct.

Q.     So you didn't call up one or the other of them and say, "I'm going to hold your side," or, "I'm going to hold the case to this much time" and then not call the other side?

A.     Correct.

Q.     I mean, your – your practice would be when talking about cases to talk about them in front of both lawyers at the same time?

A.     Correct. That – that is certainly my practice and goal.

Judge Furgeson was also asked if it would be unusual for him to talk about a case with only one lawyer present. The judge answered by describing his involvement in bar activities as a way of interacting with attorneys. He went on to state:

I might make a careless statement about a case. It's absolutely not my practice to do that, but, you know, I am human and I might make a mistake. But my – my goal is to try to avoid talking to lawyers under any circumstance about a pending case. That's my goal.

A fair reading of Judge Furgeson's testimony is that it is his practice or habit not to talk with lawyers about pending cases in social settings and not to have a substantive conversation about a

pending case with only one side. It is also his practice or habit not to limit the time allotted for the trial of a case, and in the one instance the judge had imposed a time limit before trial, he spoke with both sides before doing so. The Texas Rules of Evidence provide that "[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is *relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice*." TEX. R. EVID. 406 (emphasis added). Relevant evidence is "[e]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." TEX. R. EVID. 401.

In the summary judgment context, we must take as true Judge Furgeson's testimony about his habits and practices. The judge's testimony that it is his habit or practice not to limit the time to try a case, not to engage in substantive conversations about a case with only one side, and not to discuss pending cases in social settings, is evidence tending to make it less probable the purported conversation with McElhaney occurred. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 302 (Tex. 1990) (holding commissioners' testimony they did not recall having conversation outside of hearing and that it was their habit not to do so was some evidence sufficient to raise fact question as to whether conversation occurred).

The pre-trial history of the Nalco litigation, together with Judge Furgeson's testimony, taken as a whole and viewed in the light most favorable to Total Clean, is sufficient to raise a fact issue on whether Judge Furgeson made the alleged comment to McElhaney. Therefore, appellees were not entitled to a no-evidence summary judgment on this basis.

## EVIDENCE OF ACTUAL DAMAGES

In their second ground for summary judgment, appellees argued that, as a matter of law, Total Clean's claim for the lost profits it would have recovered had the Nalco suit been tried cannot be proven with competent evidence to a reasonable certainty. Alternatively, they argued Total Clean had no evidence of lost profits.

### *Applicable law*

"Lost profits are damages for the loss of net income to a business measured by reasonable certainty." *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). However, the loss must not be speculative:

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

*Id.* Whether a new business entity seeking entry into an existing market may recover lost profits depends on the experience of the persons involved in the enterprise, the nature of the business activity and the relevant market, and whether the profits such business might have made is "'susceptible of being established by proof to that degree of certainty which the law demands.'" *Id.* at 280 (quoting *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938)). An injured party "must do more than show that [he] suffered some lost profits" in order to recover. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994). He must show the amount of the loss by competent evidence with reasonable certainty. *Id.* "At a minimum, opinions or estimates

of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Id.; Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

### *Exclusion of evidence*

As a preliminary matter, we address Total Clean's complaint that the trial court erred in excluding the affidavit of its truck wash industry expert, Mr. Olli Lamminen, in which he states his opinions regarding the potential success of the proposed Total Clean facility.[2] Appellees objected to the use of Lamminen's affidavit as summary judgment evidence on the ground that Total Clean failed to disclose him as an expert by the deadline set forth in the trial court's scheduling order. The trial court sustained the objection.

The trial court's scheduling order called for Total Clean to designate its testifying experts by September 1, 2008. Total Clean did not list Lamminen in its designation of expert witnesses. The testimony of witnesses who are not timely designated is inadmissible as evidence absent proof and a finding of good cause or lack of unfair surprise or prejudice. TEX. R. CIV. P. 193.6(a-b); *see also Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881-82 (Tex. 2009) (holding that evidentiary exclusion under rule applies in summary judgment proceedings). Total Clean did not timely disclose Lamminen, nor did it establish good cause or lack of unfair surprise or prejudice against appellees; therefore, the trial court properly sustained appellees' objection to the affidavit.[3]

---

[2] Mr. Lamminen owns a company that designs and builds automatic truck washes.

[3] We note that appellees did not object to Total Clean's filing as summary judgment evidence a deposition Lamminen gave in a related case. However, in that deposition, Lamminen was testifying as a fact witness.

### *The lost profits reports*

To prove the amount of profits it believes it would have recovered in the Nalco litigation, Total Clean relies on the expert reports prepared by economist Dr. Keith Fairchild in the Nalco case. In the first report, dated September 2002, Dr. Fairchild assumed Total Clean would begin operations washing twenty-seven trucks per day and would be washing an average of 296 trucks per day in its fifth year of operation. Dr. Fairchild then calculated revenues and costs for the anticipated sales volumes, and subtracted costs and operating expenses from the anticipated revenues. He then calculated a terminal value and applied a discount rate of thirty percent, assuming Total Clean was a start-up operation. Dr. Fairchild concluded the present value, as of that date, of the future lost profits was approximately four million dollars.

Three and one-half months later, Total Clean's lawyers asked Dr. Fairchild to revise his report and assume the business was not a start-up, but instead had been operating for eighteen months. In addition, they asked Dr. Fairchild to project profits assuming Total Clean would be washing either 296 or 400 trucks per day by the end of its fifth year of operation. Dr. Fairchild revised his calculations and, based on the assumption the business had at least eighteen months of operating experience, lowered the discount rate to twenty percent. Dr. Fairchild's January 2003 report concluded Total Clean's lost profits would be between eight and ten million dollars.

Appellees contended in their motion for summary judgment that Dr. Fairchild's calculations are unreliable because they are not based on objective facts, figures or data, and that due to the nature of the business, the market, and Nami's lack of experience, Total Clean cannot show its claimed damages with reasonable certainty.

## *Discussion*

In preparing his second set of calculations, Dr. Fairchild assumed Total Clean had been operating successfully for eighteen months.  The principal effect of making this assumption was to decrease the discount rate from thirty to twenty percent, drastically increasing the projected lost profits.  In his deposition, Dr. Fairchild conceded the assumption was untrue, but stated he had been instructed by Total Clean's attorneys to prepare the second set of calculations based on that assumption.  When asked if he would advise a client in January 2003 to pay between eight and ten million dollars for the anticipated income stream from Total Clean, Fairchild responded, "No, because it had not been operating."  Because the opinions expressed in Fairchild's second report are based on an assumption that is contrary to the undisputed facts, the opinion is unreliable and has no probative value. *See Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637-38 (Tex. 2009) (stating that "[a]n expert's opinion might be unreliable, for example, if it is based on assumed facts that vary from the actual facts"); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499-500 (Tex. 1995) (holding that when "expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value " and constitutes no evidence).

The projected lost profits in Dr. Fairchild's earlier, September 2002, report were calculated using a thirty percent discount rate, a rate appellees concede was appropriate for a start-up company. Appellees contend the estimates of lost profits are nevertheless unreliable because Dr. Fairchild's projected truck wash volumes are not based on objective facts, figures, or data.  We agree.

Dr. Fairchild testified he did not have any experience in the truck wash industry and had no analogous business data available in formulating his projections.  He conducted research on the internet, but was only able to obtain unverifiable information about privately held companies and

representations from companies that manufacture truck wash systems. Dr. Fairchild testified that although there are a number of automated truck washes that have been operating for a period of time, he had never seen any information from any source showing the actual performance of an automatic truck wash operation, and he did not verify that any had been profitable.

Dr. Fairchild testified that in formulating his assumptions and projections about the number of trucks Total Clean would wash per day, he relied on (1) information provided by Olli Lamminen to the Namis in a March 2000 fax; (2) information provided by Lamminen about the performance of other automated truck washes; (3) information from the Texas Department of Transportation about the number of trucks passing the location and the rate of growth of truck traffic; and (4) projections based on the volume of diesel sales in the area.

Dr. Fairchild assumed Total Clean would initially wash twenty-seven trucks per day. His profit projections assume Total Clean would wash an average of 129 trucks a day by the beginning of the second year, 201 trucks by the beginning of the third year, and 296 trucks a day by the beginning of the fifth year. Dr. Fairchild was unable to testify where the initial figure of 27 trucks per day came from. He stated he used his own experience to make assumptions about the rate sales volume would increase over five years, but that the validity of the growth rate he used could not be tested.

Dr. Fairchild's principal source for his volume projections was a fax from Lamminen to the Namis, dated March 18, 2000, in which Lamminen stated he "expected wash volume could average between 150 and 300 trucks per day" through the Total Clean facility. However, Lamminen testified he sent the fax at Bobby Nami's insistence because Nami needed a high volume estimate in order to get financing. Lamminen testified he "was a bit uneasy sending [the] document because the

number had never been done," and that is why he used phrases such as "could average." Dr. Fairchild testified that it now appears Lamminen "was making [the numbers] up," and acknowledged that when he prepared the lost profit reports, he was relying on information he now knows is not credible.

Dr. Fairchild had not reviewed actual performance data from any truck wash operations, but he testified his volume projections were supported by anecdotal evidence of the performance of other truck washes. He testified he had seen information provided by Lamminen that a Madco facility in Detroit washed 150 to 200 trucks a day, and that he had received information about truck washes in Australia, Illinois, Florida, and Las Vegas that supported his projections.[4]

The anecdotal information provided by Lamminen in the deposition Total Clean filed in response to the motion for summary judgment does not support the volumes Fairchild used in his profit projections. Lamminen testified the Madco facility washed less than 100 trucks a day on average, the facility in Australia washed between sixty and seventy trucks a day, and the facility in Monee, Illinois averaged fifty to seventy washes a day. The truck wash in Florida washed fewer than thirty trucks a day for the first nine months of operation, and was losing money. Its volume increased to an average of 70 a day, but only after its management was replaced with someone with a highly technical background who had significant experience in operating truck washes. Lamminen testified the busiest truck wash in the United States was the one in Las Vegas, which washed 100 trucks a day. According to him, the Las Vegas site was better than the proposed Total Clean site.

---

[4] Dr. Fairchild did not provide any detail about the source or substance of the information he received regarding these facilities.

Lamminen testified he had never heard of a commercial automatic truck wash that averaged 200 trucks a day.

Finally, Dr. Fairchild testified his projections were supported by data from the Texas Department of Transportation regarding the number of trucks that pass the site and Lamminen's estimates of the volume of diesel sales in the area of the proposed Total Clean facility. The witnesses all agree the intersection by the proposed site has one of the highest volumes of truck traffic in the country. However, Dr. Fairchild testified he did not conduct any study or consider in his projections how many of those trucks were part of fleets that had their own fleet truck washes, what percentage of the passing trucks would stop for a wash, or Total Clean's expected share of that market.[5] Dr. Fairchild also relied on information from Lamminen about the ratio of truck washes at the Madco facility to the volume of diesel sales. According to Dr. Fairchild, Lamminen led him to believe there was a correlation between the volume of diesel sales in the area and the number of truck washes. It was estimated that the amount of diesel pumped in the area of the Total Clean facility was significantly higher than at Madco, leading Dr. Fairchild to conclude Total Clean would wash significantly more trucks. However, Dr. Fairchild did not confirm the information about the amount of diesel pumped, either at Madco or in San Antonio and could not confirm any correlation actually existed. Moreover, Lamminen testified he "would strongly deny" any correlation between the volume of diesel pumped in the area and the number of truck washes that could be expected. He testified his company had conducted a study of diesel sales and truck wash volumes, and that a statistical analysis of the data showed there was no correlation between them.

---

[5] There are two competing truck washes in close proximity to the Total Clean site.

Total Clean presented no evidence that the Namis had any experience in the truck wash business or that they planned to hire skilled, experience management. It produced no evidence of market demand for an automated truck wash in San Antonio, and produced no evidence the demand would have been sufficient for it to make a profit. Dr. Fairchild conceded that if his estimated volumes were not reliable, then his opinion regarding future lost profits is not reliable. He testified in his deposition in this case that, given his current knowledge, he cannot say his lost profit projections are reliable.

We conclude Fairchild's estimates of the number of trucks that would be washed by Total Clean were not based on objective facts, figures, or data. Moreover, his January 2003 calculations were based on assumptions he knew to be untrue. Fairchild's estimate of lost profits was "without any evidentiary foundation and therefore, is purely speculative and conclusory." *See Szczepanik*, 883 S.W.2d at 650. Because Total Clean failed to produce any competent evidence that profits were reasonably certain, there is no evidence to support a claim for future lost profits and summary judgment was proper on that ground. *See Texas Instruments*, 877 S.W.2d at 280; *El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 366 (Tex. App.—Dallas 2005, no pet.).

In their motion for summary judgment, appellees asserted the only actual damages claimed by Total Clean in the suit were its lost profits, and appellees thus sought summary judgment on the whole case. Total Clean stated in its summary judgment response that it was also seeking forfeiture of attorneys' fees because of the breach of fiduciary duty. However, Total Clean did not dispute appellees' assertion that the only actual damages Total Clean seeks are the future lost profits it contends it would have recovered had the Nalco suit been tried. In its reply brief on appeal, Total Clean asserts for the first time that its actual damages include exemplary and "additional damages"

it could have recovered in the Nalco litigation. Total Clean did not mention these elements in its response to the motion for summary judgment, nor did it point the trial court to any summary judgment evidence supporting its contention it would have recovered such damages in the underlying litigation. We conclude the trial court properly granted appellees' motion on the ground there is no evidence of actual damages, and the court properly rendered a judgment in favor of appellees on the negligence, negligent misrepresentation, and fraud claims. *See Swank v. Cunningham*, 258 S.W.3d 647, 672 (Tex. App.—Eastland 2008, pet. denied); *El Dorado Motors*, 168 S.W.3d at 368. However, a finding of actual damages is not necessary to obtain a forfeiture of attorney's fees where a "clear and serious" breach of fiduciary duty is shown. *Burrow v. Arce*, 997 S.W.2d 229, 240, 246 (Tex. 1999). Accordingly, Total Clean's failure to produce evidence of lost profits does not dispose of the breach of fiduciary duty cause of action.

### FAILURE TO DESIGNATE EXPERT

In its third and final ground for summary judgment, appellees generally asserted they were entitled to summary judgment on all causes of action because Total Clean failed to designate liability experts (1) to testify about the standard of care and breach of the standard, and (2) to establish causation – that Total Clean would have prevailed and recovered damages in the underlying suit.[6] On appeal, appellees have abandoned the first ground and argue only that Total Clean was required to have an expert to prove it "would have prevailed in the underlying case and actually recovered its lost profits from Nalco but for McElhaney's alleged lie." However, appellees have not provided any argument or authority to support its contention that Total Clean must prove a "suit within a suit" to

---

[6] Due to our disposition of the damages issue, we need only decide whether appellees were entitled to summary judgment on the breach of fiduciary duty cause of action because of Total Clean's failure to designate a liability expert.

prevail on its breach of fiduciary duty claim and recover the equitable remedy of fee forfeiture. *See id*. Appellees therefore have not shown themselves entitled to summary judgment on the breach of fiduciary duty claim.

## CONCLUSION

For the reasons stated above, we hold the trial court did not err in granting summary judgment on Total Clean's claim for lost profits, and we affirm the judgment in favor of appellees on Total Clean's negligence, negligent misrepresentation, and fraud causes of action. We reverse the trial court's summary judgment in favor of appellees on Total Clean's breach of fiduciary duty claim and remand the cause to the trial court for further proceedings consistent with this opinion.

Steven C. Hilbig, Justice