**Reverse and Render; Opinion Filed August 21, 2013.**



In The
**Court of Appeals
Fifth District of Texas at Dallas**

**No. 05-11-00769-CV**

**TIMOTHY BARTON, JMJ HOSPITALITY, L.L.C. AND JMJ HOLDINGS, L.L.C,**
**Appellants**
**V.**
**RESORT DEVELOPMENT LATIN AMERICA, INC., ALIBER GARCIA AND ELIUD**
**GARCIA, Appellees**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-07-10870-F**

## OPINION

Before Justices Moseley, Bridges, and Lang
Opinion by Justice Moseley

Appellants Timothy Barton, JMJ Hospitality, L.L.C., and JMJ Holdings, L.L.C. appeal an

adverse judgment in favor of appellees Resort Development Latin America, Inc. (f/k/a JMJ

Development Mexico, Inc.),[1] Aliber Garcia, and Eliud Garcia, which was entered following a

jury verdict. Appellees' damages are based on lost profits. In their issues on appeal, appellants

argue, among other things, that there is no evidence of causation to support the jury's damage

awards and no evidence showing the existence and amounts of lost profits with reasonable

certainty. We agree. Therefore, we reverse the trial court's judgment awarding damages to

appellees and render judgment that appellees take nothing.

---

[1] During the time giving rise to the events that are the subject of this litigation, appellee Resort Development Latin America, Inc. was known as JMJ Development Mexico, Inc. We will refer to the entity as JMJ Development Mexico.

## I.     BACKGROUND

Barton, Aliber, and Eliud formed JMJ Development Mexico to develop real estate projects in Mexico.  The parties' focus was on developing high-end resorts.  In April 2006, Aliber and Eliud identified two properties on the Riviera Maya for possible development:  the "Shabshab Property" where they sought to develop a resort under the W Hotel brand, and the "Preciado Property" where they sought to develop a resort under the St. Regis Hotel brand.  It was intended that each resort development would include a hotel as well as villas and apartments.

As discussed in more detail below, over the next several months the Garcias entered into a non-binding proposal with an entity concerning the possible purchase of the Shabshab Property and a non-binding letter of intent (LOI) with an investor who was interested in investing part of the equity needed to develop the W Hotel project.  They also received non-binding letters of interest from the entity that owned both the W Hotel and the St. Regis Hotel brands, Starwood Hotels & Resorts Worldwide, Inc. (Starwood).

In the spring of 2006, several months after Aliber and Eliud began working to pursue opportunities for JMJ Development Mexico, Barton formed a new company, appellee JMJ Hospitality.  There is some evidence that on or about July 15, 2006, Barton and JMJ Hospitality contacted Mexican landowners and instructed them not to deal with Aliber and Eliud anymore; instead, the landowners should deal with Barton and JMJ Hospitality.  Aliber and Eliud presented evidence that two Mexican landowners then suspended negotiations with JMJ Development Mexico and a third ceased negotiations.  Neither the Garcias nor JMJ Development Mexico ever acquired the properties they had considered developing as resorts.

Appellees sued appellants for breach of fiduciary duty, breach of contract, tortious interference with existing and prospective contracts, and conspiracy.  They alleged that

appellants' actions caused them to lose the opportunities to develop the Shabshab and Preciado Properties. Appellees presented expert testimony from Bruce Goodwin to support their request for damages.

The jury found that Barton breached his fiduciary duty to JMJ Development Mexico; that at least one appellant interfered with JMJ Development Mexico's contract to buy real estate in Mexico; and that at least one appellant intentionally interfered with a prospective contractual or business relationship of JMJ Development Mexico. The jury awarded JMJ Development Mexico $7 million for lost profits sustained in the past and $0 for lost profits it would sustain in the future.

The jury also found that Barton failed to comply with the shareholder agreement with the Garcias; on that basis, the jury awarded the Garcias $0 for lost profits sustained in the past and $3 million for lost profits that, in all reasonable probability, they would sustain in the future. The trial court rendered a final judgment based on the jury's verdict.

## II.    ISSUES ON APPEAL

In their ninth issue, appellants assert that appellees failed to present legally sufficient evidence related to the issue of causation and the trial court erred by submitting damages questions to the jury. In their tenth issue, appellants assert the evidence is legally and factually insufficient to support the jury's damages awards. They argue the only testimony and evidence offered by appellees regarding damages was based on and the result of pure speculation and conjecture. Because these two issues are closely related, we discuss them together. In doing so, we reject appellees' argument that appellants failed to preserve their ninth issue for appeal. [2]

---

[2] Appellants' motion to vacate, modify, correct or reform final judgment, or for new trial, included the following arguments:

The only remaining remedy for alleged injury by breach of fiduciary duty was to recover economic damages caused by the alleged breach of fiduciary duty. Plaintiffs did not prove economic damages from the alleged breach of fiduciary duty.

. . .

### III. STANDARD OF REVIEW AND APPLICABLE LAW

When, as here, appellants attack the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that no evidence supports the finding. *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 453 (Tex. App.—Dallas 2012, pet. denied) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). There is "no evidence" when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. We review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See id.* at 820-21.

Lost profits are damages for the loss of net income to a business, reflecting income from the lost business activity, less expenses that would have been attributable to that activity. *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 840 (Tex. App.—Dallas 2012, no pet.). The calculation of lost-profit damages must be based on net profits, not on gross revenue or gross profits. *Id.* (citing *Holt Atherton Indus. v. Heine*, 835 S.W.2d 80, 83 n.1

---

All that was shown in the evidence was business judgment with no, or insufficient consequential evidence to show a causal connection with any damage.

. . .

Plaintiffs had no economic damages arising from Defendants' alleged conduct. The jury's award of damages to [JMJ Development Mexico] and future damages to the Garcia Brothers was based on speculative opinion testimony that a resort hotel development would occur with factors favoring the best possible outcome, for a development project that was not built and for non-existent future resort hotel developments, for which no reasonable probability was shown. The reality is that the Plaintiffs never developed any luxury resort real estate development projects, so the "past lost profits" and "future lost profits" damages awarded by the jury resulted in a windfall to the Plaintiffs, which defeats the statutory purpose of compensatory damages . . . .

We conclude appellants' motion was sufficiently specific to make the trial court aware of their complaint. *See* TEX. R. APP. P. 33.1(a).

(Tex. 1992)). Although recovery for lost profits does not require that the loss be susceptible to an exact calculation, a party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (quoting *Holt Atherton Indus.*, 835 S.W.2d at 84); *Exel Transp. Servs., Inc. v. Aim High Logistics Servs., LLC*, 323 S.W.3d 224, 232 (Tex. App.—Dallas 2010, pet. denied) (quoting *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curium)). What constitutes reasonably certain evidence of lost profits is a fact-intensive determination. *Swinnea*, 318 S.W.3d at 876 (quoting *Holt Atherton Indus.*, 835 S.W.2d at 84). "[At] a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.*; *Excel Transp. Servs., Inc.*, 323 S.W.3d at 232 (quoting *Szczepanik*, 883 S.W.2d at 649).

If no evidence is presented to prove lost profits with reasonable certainty, the trial court must render a take-nothing judgment as to lost-profits damages. *See, e.g., Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 281 (Tex. 1994) (concluding there was no evidence to prove lost profits with reasonable certainty and affirming trial court's order granting judgment notwithstanding the verdict as to the lost-profits damages); *Examination Mgmt. Servs., Inc.*, 367 S.W.3d at 847-48.

## IV.    THE W HOTEL PROJECT

Appellees' alleged damages arise from the failure to develop two projects: a W Hotel and resort on the Shabshab Property and a St. Regis Hotel and resort on the Preciado Property. We begin with the development of a proposed W Hotel project on the Shabshab Property.

Our review of the evidence as to the likelihood that the underlying transactions necessary for the development of a W Hotel to have taken place, evidence of changing economic factors during the relevant time period, and evidence of damages resulting from the failure to develop a

W Hotel and resort on the Shabshab Property—even when viewed in the light most favorable to the jury's verdict—makes it clear appellees did not prove the existence or amount of lost profits with reasonable certainty and that the "opinions or estimates of lost profits" upon which appellees rely are not based on "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Swinnea*, 318 S.W.3d at 876; *Exel Transp. Servs., Inc., LLC*, 323 S.W.3d at 232.

### A. Uncertainty Regarding the Necessary Underlying Transactions

#### 1. Evidence

In December 2004, Shabshab contracted to sell the property to Inland Immobiliaria, S.A. for $7.7 million, to be paid by August 30, 2005, at the latest. The contract also provided for a "final contract for sale and purchase must be executed . . . by August 30, 2005, at the latest, provided that the [seller] deems the purchase price to be paid satisfactorily." The contract required a portion—$200,000—of the purchase price to be paid in January 2005; the contract stated that "in the event the final contract for this commitment is not executed within the time and form agreed upon," Shabshab would keep the $200,000 as "indemnization for the harm and damage incurred as a result of this breach . . . ."

The Shabshab–Inland contract also provided for Shabshab to provide clear title to the property "free of all liens, limitations of ownership . . . ." Indeed, by signing the contract Shabshab declared that the property was "free of all liens, charges or limitations of ownership, guarantees in favor of third parties, or disputes of any nature . . . ." The only evidence in the record indicates this declaration was not true; the Shabshab Property had title problems and was the subject of title litigation with a Spanish or Mexican company referred to in the record as OHL, as well as title litigation with an American corporation, The Kor Group.

It is undisputed that the "final contract for sale" referenced by the Shabshab–Inland contract was never executed; that the purchase price was never paid; and that Inland never obtained title—clear or otherwise—to the Shabshab Property. There is some evidence the contract expired on August 30, 2005, according to its terms, and no evidence it did not do so.

Nevertheless, some eight months later, on April 4, 2006, JMJ Development Mexico proposed to acquire the Shabshab Property from Inland for $12.5 million. The proposal, which Inland "accepted," provided for execution of a final contract "[w]ithin a maximum time period of thirty days . . . ." Under the proposal, JMJ Development Mexico promised to pay $2.5 million within ninety days, after conducting its due diligence, "if no issues arise therefrom." The remaining $10 million would, at Inland's option, either be paid at closing or Inland would contribute that receivable to the development and become an investor in the project for that amount. The proposal also specified that the date of payment "will be subject to the resolution of the lawsuit that the property is involved in with the U.S. corporation, The Kor Group."[3]

It is undisputed that a final contract was not executed within thirty days of April 4, 2006, that JMJ Development Mexico did not pay $2.5 million to Inland within ninety days of that date, that the litigation with The Kor Group was not resolved, and that JMJ Development Mexico did not acquire the Shabshab Property. There is some evidence this proposal expired according to its terms on July 3, 2006, and no evidence it did not.

Nevertheless, the Garcias, on behalf of JMJ Development Mexico, sent a proposed LOI dated July 5, 2006, to Andrea Vezzani, a potential investor who was interested in developing a W Hotel project. In the LOI, JMJ Development Mexico stated it had "reached an agreement" to acquire the Shabshab Property for $3.5 million in cash and a $10 million investor's share in the development, and that it was "preparing the definitive agreements." JMJ Development Mexico

---

[3] The proposal did not mention the OHL litigation concerning title to the Shabshab Property.

also stated it "is also currently in negotiations with the Starwood Hotels and Resorts Worldwide for The Project to be a W Hotel and Villa resort." Vezzani signed the LOI on or about July 14, 2006. The LOI stated it was not binding and was only an expression of the parties' interests.

Upon receipt of the signed LOI from Vezzani, Aliber e-mailed Barton stating, in part, that when agreements with the seller of the Shabshab Property are signed, "the law suits with KOR and OHL need to be resolved simultaneously. When do you think we could set up a meeting . . . to define how the issue will get resolved?" There is no evidence the lawsuits were ever resolved, or on what terms they could have been resolved.[4]

In June 2006, the Garcias obtained a letter from Starwood expressing an interest in evaluating a management agreement for a W Hotel on the Shabshab Property, if JMJ Development Mexico acquired the property. The letter stated it was only an "expression of our interests to further evaluate these opportunities, and does not create any legally binding obligation on Starwood. You should not rely on this letter . . . ."

### 2. Analysis

Taken together and viewed in the light most favorable to the jury's verdict, the evidence does not show with any reasonable certainty that a W Hotel would have been built on the Shabshab Property. Awarding lost profit damages based on these facts would be to impermissibly allow appellees to collect damages for a speculative transaction.

To conclude JMJ Development Mexico would ever have developed a W Hotel resort on the Shabshab Property, we would be required to stack assumption upon assumption, which we will not do. *See Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 633-35 (Tex. App.—Houston [1ˢᵗ Dist.] 2010, pet. denied) (citing *Holt Atherton*, 835 S.W.2d at 85-86; *Atlas Copco*

---

[4] Aliber testified Barton told him that he (Barton) thought the OHL lawsuit could be resolved. Barton testified the only way he saw to resolve the OHL suit was to bring OHL in as an investor. There was no evidence that OHL would have become an investor, or on what terms it would have become an investor.

*Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 208-09 (Tex. App.—Fort Worth 2004, pet. denied); *Capital Metro. Transp. Auth. v. Cent. of Tenn. Ry. & Navigation Co., Inc.*, 114 S.W.3d 573, 581-82 (Tex. App.—Austin 2003, pet. denied)) (assumptions without supporting evidence insufficient for lost profit damages); s*ee also Teleresource Corp. v. Frontier Computer Corp.*, No. 05-99-01134-CV, 2000 WL 799074, at *11 (Tex. App.—Dallas June 22, 2000, pet. denied) (not designated for publication) ("Despite the mathematical precision with which [witness] calculated Frontier's damages, we conclude there is little, if any, factual basis for the assumptions underlying many of his figures."). We would have to assume that, among other things, (1) despite the expiration of the Shabshab-Inland contract, Inland would still have acquired the property from Shabshab; (2) despite the expiration of the non-binding proposal, Inland would have sold the Shabshab Property to JMJ Development Mexico; (3) the title disputes on the Shabshab Property would have been resolved and JMJ Development Mexico would have obtained clear title; (4) Vezzani would have provided equity funding along the lines of the non-binding LOI; (5) Vezzani would have agreed to provide the remainder of the needed equity funding, or JMJ Development Mexico would have found another equity investor; (6) JMJ Development Mexico would have found a lender willing to provide the debt funding needed for the project; and (7) Starwood would have agreed to put a W Hotel on the Shabshab Property and the terms on which it would have done so. In addition, we would have to assume that the terms of each of these transactions were such as would allow the development—including the other transactions involved—to go forward. None of these assumptions are supported by facts in the record and, therefore, they cannot form the basis for appellees' damages award. *Szczepanick*, 883 S.W.2d at 650 (evidence without evidentiary foundation is purely speculative and conclusory and is no evidence of lost profit damages).

Even Goodwin, appellees' expert, acknowledged he assumed the speculative W Hotel project would have been completed when he performed his damages analysis. He testified: "the land transaction was moving effectively down the trajectory toward completion, that the impediments that might exist should be able to be resolved, that the market conditions at that time were exceedingly strong, that the brand and the management fit the concept and the location, that the occupancies and the average room rates projected were consistent with other luxury hotels in Mexico. . . ."[5] None of his assumptions are supported by the evidence.

We conclude the evidence concerning the underlying transactions necessary for the development of a W Hotel—even when viewed in the light most favorable to the jury's verdict— does not prove with reasonable certainty that JMJ Development Mexico would ever have completed such a development, and thus does not prove the existence or amounts of lost profits with reasonable certainty. *See Swinnea*, 318 S.W.3d at 876; *Exel Transp. Servs., Inc., LLC*, 323 S.W.3d at 232. Rather, appellants' projection that they suffered lost-profit damages is "without any evidentiary foundation and therefore, is purely speculative and conclusory." *Szczepanik*, 883 S.W.2d at 650; *Total Clean, L.L.C. v. Cox Smith Matthews, Inc.*, 330 S.W.3d 657, 667 (Tex. App.—San Antonio 2010, pet. denied).

## B. Subsequent Economic Developments

### 1. Evidence

In addition to appellees' failure to present any evidence showing the W Hotel project would have been constructed in the absence of appellants' actions, appellees failed to account for the changing economic conditions—the recession—that occurred during the time they projected to develop the W Hotel. Appellees' expert, Goodwin, acknowledged in his testimony that

---

[5] Appellees did not intend that Goodwin would testify about whether Barton's actions likely derailed the deal. Counsel for appellees represented to the Court that Goodwin's testimony assumed that the deal was going forward and Goodwin was only intended to calculate the amount of the loss if the deal occurred. In his testimony, Goodwin did not offer any evidence about causation.

Mexico was not spared from the economic recession, and by "the end of the first quarter of 2008, pretty much everything had stopped." At the time the recession occurred, because the W Hotel project "would have been just starting out, in all likelihood the project would be suspended and -- and put on hold for a period of time, which I would assume now in hindsight is probably three to five years." The project would have been mothballed. Goodwin believed the project could have resumed "at the end of 2011 or beginning of 2012, I'm not - - I'm not prepared to say."

### 2. Analysis

Profits are largely speculative, not reasonably certain, and cannot be recovered, if they result "from an activity dependent on uncertain or changing market conditions." *Tex. Instruments, Inc.*, 877 S.W.2d at 279. The successful development of the W Hotel project was dependent on, among other things, the economic climate remaining favorable to such a development, as the market apparently was when JMJ Development Mexico first began working on the development in 2006. However, the undisputed evidence in the record shows the economic climate changed; the recession caused "pretty much everything" to stop and the W Hotel project "in all likelihood" would have been mothballed for three to five years. Because of the uncertain and changing market conditions in which the appellees proposed to develop the W Hotel project, the lost profits they seek to recover were speculative and not reasonable certain. *See id.*

### C. Problems with Damage Computations and Testimony

Even if we were to assume that appellees showed the W Hotel likely would have been developed and developed on the time-frame they originally projected, appellees' evidence of the amount of their "lost profit" damages resulting from their failure to develop the W Hotel project is legally insufficient.

–11–

Appellees' evidence as to the amount of its damages consists of two exhibits, Plaintiffs' Exhibits 94 and 93 (PX 94 and PX 93), and the testimony of Aliber and Goodwin.

PX 94 is a financial projection, as of October 15, 2006, of the income anticipated from the development, operation, and eventual sale of the W Hotel. In response to his attorney's inquiry as to who prepared the financial projections, Aliber testified "I personally did a lot of work." Aliber gave this financial projection—less the front page—to Vezzani, the possible investor in the project, before Vezzani signed the letter of intent dated July 5, 2006.

The front page of PX 94—the page Aliber did not give to Vezzani—is entitled "SUMMARY INCOME TO JMJ DEVELOPMENT MEXICO, INC. FROM 'W' HOTEL PROJECT ON THE RIVIERA MAYA," and is a spreadsheet setting forth various sources of income projected to flow to JMJ Development Mexico from the project. Portions of the spreadsheet appear to be based on information on the other pages of PX 94. According to the first page of PX 94, JMJ Development Mexico projected that if it built, held, and ultimately sold the W Hotel project on the Shabshab Property, it would receive income of over $73 million over a ten and one-half year of time. Using a discount rate of ten percent, it computed the present value of that income to be almost $34.5 million as of October 15, 2006.

PX 93, prepared by appellees' expert Goodwin, is also an income projection for the W Hotel project. It consists of two pages; the first page is the same spreadsheet as the first page of Aliber's PX 94, along with some handwritten notes by Goodwin. Goodwin said that Aliber told him the projections were created by Aliber and people in Barton's Dallas office. Goodwin had no other knowledge of the basis or accuracy of the information in PX 94. The second page of PX 93, entitled "BG[6] SUMMARY INCOME TO JMJ DEVELOPMENT MEXICO, INC. FROM

---

[6] BG are Goodwin's initials.

'W' HOTEL PROJECT ON THE RIVIERA MAYA," is, in general, the spreadsheet from the first page of Aliber's PX 94, as revised by Goodwin to reflect his own opinions.

Based mostly on the second page of PX 93, Goodwin's testimony was that JMJ Development Mexico would have received income of over $33 million from developing, holding, and selling the W Hotel project. Using the same ten percent discount factor as was used in PX 94, the present value of that income stream as of October 15, 2006, was $18,640,737.79. After accounting for JMJ Development Mexico's payment of 30 percent of that amount pursuant to a license agreement,[7] Goodwin's opinion was that "Garcia Brothers" (actually JMJ Development Mexico)[8] suffered damages in the amount of 70 percent of that projected, discounted amount, or $13,048,516.46.

However, both PX 94 and PX 93 projected that JMJ Development Mexico would have received $2,964,000 from the W Hotel development in October 2006, as follows:

- A $1 million land brokerage fee. Aliber testified this fee was to be paid at the closing for the land purchase.[9] As noted above, whether JMJ Development Mexico would ever have acquired the Shabshab Property is speculation, as is the purchase price for any such acquisition.[10] Thus, the $1 million spread between them does not represent an actual

---

[7] JMJ Development Inc. held the United States trademark for "JMJ Development," which JMJ Development Mexico desired to use. Thus JMJ Development Mexico had entered into a licensing agreement agreeing to pay JMJ Development Inc. thirty percent of any and all "net revenues and fees (after subcontracting Third Parties' costs) derived . . . from Real Estate Development activities." Aliber's PX 94 did not make allowance for the license agreement.

[8] PX 93 states that $13,048,516.46 would be received by the "Garcia Brothers," not JMJ Development Mexico. Goodwin testified this amount would have been received by JMJ Development Mexico. Goodwin did not provide any testimony about damages specific to Aliber and Eliud, apart from damages to JMJ Development Mexico.

[9] It appears this amount represents the difference between the $12.5 million purchase price stated in JMJ Development Mexico's proposal to Inland (Aliber actually testified $12.5 million was the sale price from Shabshab to Inland) and the $13.5 million amount of the land costs set forth in the non-binding LOI between JMJ Development Mexico and Vezzani.

[10] It is undisputed that that the proposed land transaction between JMJ Development Mexico and Inland was not then—or ever—enforceable. It is also undisputed that Inland never acquired title to the Shabshab Property (and thus did not have title to convey), and that when Inland agreed to JMJ Development Mexico's proposal, it did not have the legal right to obtain title from Shabshab. Additionally, the JMJ Development Mexico–Inland proposal required the resolution of the litigation concerning title of the Shabshab Property, which had to be resolved before the hotel could be developed. There is no evidence that litigation was resolved, or what such a resolution would cost.

transaction, and its use in the exhibits and in Aliber's and Goodwin's testimony is no more than *ipse dixit*.

- $350,000 in "Equity Funding Fees" with respect to the Hotel portion of the development. Goodwin testified this amount represented "fees for the (sic) Vezzani, for lack of a better term commission . . . ." Aliber testified the fee represents an amount charged "by a party that assists the project in finding and–finding and obtaining investors for the project."[11] Based on PX 94, the fee represented five percent of $7 million in equity for the development. However, PX 94 calls for shareholder investments totaling $14.2 million. Further, in the non-enforceable LOI, Vezzani talks about providing only $5 million in equity funding (i.e., funding for 2006 only), with a "right of first refusal" to fund the project's additional equity requirements. There is no evidence that JMJ Development Mexico could close the agreement discussed in the Vezzani LOI or that Vezzani would fund any additional amounts of equity, and there is no evidence as to whether JMJ Development Mexico could find the additional equity financing, or from whom and on what terms. These are matters of speculation.

- $1,590,000 in "Debt Funding Fees" with respect to the hotel portion of the development. Aliber described this as "a similar fee [to the equity funding fee] paid to the party that assists the project in obtaining bank loans for the construction of the project." Aliber agreed that these fees are "not always part of the deal." Based on PX 94, the Debt Funding fee constitutes three percent of a proposed $53 million in debt necessary for the project. There is no evidence in the record that JMJ Development Mexico would have obtained that financing or from whom it would come, and no evidence as to the terms on which such financing might

---

[11] Goodwin testified this fee is "occasionally" paid to a developer. Aliber acknowledged that the fee is not standard, and it is "sometimes" paid.

–14–

be offered. Based on this record, whether JMJ Development Mexico would have earned the Debt Funding Fees is a matter of speculation.

- $24,000 for "Pre-Development Expenses – 2006" with respect to the Hotel portion of the development. By Aliber's own definition this amount represents funds received to cover costs and operations related to the development—not profits.[12]

In addition to the speculative nature of the transactions and terms of the agreements that are the basis for PX 94 and PX 93, the amounts included in both projections for the land brokerage fee, the equity funding fee, and the debt funding fee are all income, not profits. There is no indication of the expenses that would be involved in accomplishing—if they were accomplished—the transactions giving rise to those income items.

The two spreadsheets also project receipt of the four additional fees, paid in monthly portions during 2007 and 2008:

- A $1,232,312.44 "Development Fee 50% Margin" with respect to the Hotel portion of the development. Aliber testified this fee, calculated as a percentage of the construction costs and divided into monthly payments[13] over the period involved in implementing the project, "is for the developer to be able to cover staff costs, coordination of the different activities that have to be involved in the process of implementing the project."

- $92,423 for "Project Site Coordination & Supervision 15% Margin" with respect to the Hotel portion of the development. Aliber testified this amount was included because, "[i]n addition to the group of people that work in the coordination of the activities, there's specific activity

---

[12] Aliber testified the "pre-development expenses" represent reimbursement for initial costs involved in such activities as conceptualizing and preparing design plans (without detailed engineering or architectural work), obtaining permits, and paying legal fees.

[13] This fee was to be received in monthly installments, with 40 percent to be received in 2007 and 60 percent in 2008.

at the site to supervise and coordinate the physical activities that are being implemented on a day-to-day basis."[14]

- $1,961,925 for "JMJ/MEX Marketing Supervision" with respect to the hotel portion of the development, as well as $2,982,140 for "JMJ/MEX Marketing Supervision" for the villas and apartments portion of the development. Aliber described these fees as "included in the projections to coordinate the activities of the marketing effort and the sales effort of the units that would be sole as real estate product."[15]

As shown above, these fees are also payments to cover costs and operations related to the development—not profits.[16]

There also is no evidence that PX 93 accounts for expenses associated with developing and operating the W Hotel. *See, e.g., Holt Atherton Indus.*, 835 S.W.2d at 84 (proof of "lost income" is not proof of lost profits); *Examination Mgmt. Servs., Inc.,* 367 S.W.3d at 841; *Excel Transp. Servs., Inc.*, 323 S.W.3d at 232 (correct measure of damages are net profits, "what remains in the conduct of business after deducting from its total receipts all of the expenses incurred in carrying on the business."). Although PX 94 included some information about expenses (although it certainly did not include all expenses associated with the W Hotel project), there is no indication PX 93 includes any of that information. Further, PX 93's title, "BG SUMMARY INCOME TO JMJ DEVELOPMENT MEXICO, INC. FROM "W" HOTEL PROJECT ON THE RIVIERA MAYA," indicates it only includes projected income figures— not profits.

---

[14] This fee was to be received in monthly installments, with 40 percent to be received in 2007 and 60 percent in 2008.

[15] These fees were projected to be received in monthly installments. For the hotel portion of the project, 63 percent of the Marketing Supervision fee was projected to be received in 2007, with 37 percent received in 2008. For the villas and apartments portion of the project, 52 percent of the Marketing Supervision fee was to be received in 2007, with 48 percent received in 2008.

[16] According to both PX 94 and PX 93, these amounts were projected to be paid to JMJ Development Mexico at the rate of $276,385 per month during 2007 and $246,015 per month during 2008.

Thus, even when viewed in the light most favorable to the jury's verdict, appellees' PX 94, PX 93, and the testimony surrounding them does not prove the existence or amount of lost profits with reasonable certainty; the "opinions or estimates of lost profits" upon which appellees rely are not based on "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Swinnea*, 318 S.W.3d at 876; *Exel Transp. Servs., Inc., LLC*, 323 S.W.3d at 232.

## D. Problems with "Profit Sharing" Projections in Particular

### 1. Evidence

There are two entries in both PX 94 and PX 93 that specifically relate to "profits." Both projections indicate JMJ Development Mexico would have received "Profit Shares" with respect to both the villas and apartments portion and the hotel portion of the development. Aliber's testimony provided the clearest description of what "Profit Shares" meant:

> The investors that participate in a project of this nature are looking to make a profit. Okay? That's why they are investing in the project. A level of profitability is agreed upon with the investor that will satisfy him as a minimum profitability, and once the project has provided him with that level of profitability and paid him his initial investment, the project continues generating money.

> And after that stage, after that moment in which he has been paid back his profitability and his initial investment, then there is an agreement reached in which the additional cash that the project generates is divided between the investor and the developer at whatever the percentage is agreed upon, and that varies project by project to whatever the two parties agree. Usually the investor takes the larger portion and the developer is left with a smaller portion. And this line item refers to the profit sharing that would exist down the line, once the investor has been repaid, in the additional cash generated by the project.

In other words, the projected "profit share" for each portion of the development was calculated by taking the total projected income of that portion, subtracting the amount of the investors' original investment in that portion of the development as well as an agreed minimum return on that investment, and multiplying the remainder by a percentage amount agreed to by the investors and the developer as being payable to the developer, with the rest going to the investor.

–17–

Both PX 94 and PX 93 projected receiving a "Profit Share" of $5,791,031 in April 2009 for the villas and apartments portion of the development. With respect to the amount of projected profit share for the hotel portion of the development, however, the two exhibits and their sponsoring witnesses differ significantly. Aliber's PX 94 projected that amount to be $58,541,176. PX 93, prepared by Goodwin, projected that amount to be $18,161,531, or about $40 million less.[17] Goodwin's explanation of the difference between his and Aliber's figures is as follows:

> these models are effectively a summary that captures all the income source from the projections that Mr. Aliber Garcia made [PX 94]. I looked at those projections and I reviewed them, and I saw some areas that I felt I wanted to take a more conservative approach. So I made some adjustments. I lowered some occupancies, I lowered some average room rates, and I made some adjustments in lowering prices per square meter on some of the residential real estate. So as a result of that, as opposed to the $58 million profit share that appears in the hotel portion of [Aliber's] model, my numbers turned out to be $18 million.

With respect to the calculations of "all the income source" from the hotel portion of the project, there is no evidence as to what numbers Aliber used in his PX 94 for occupancy rates, average room rates, or the "prices per square meter on some of the residential real estate." There is no evidence as to what numbers Goodwin used instead of Aliber's numbers. And there is no evidence as to the rationale for the numbers used by either, except for Goodwin's statements that he "felt [he] wanted to take a more conservative approach" but that the "occupancies and the average room rates projected were consistent with other luxury hotels in Mexico . . . ."[18]

---

[17] Both PX 94 and PX 93 projected receipt of the profit share in annual payments—between April 2011 and April 2017—in differing amounts. Both spreadsheets projected the largest—by far—of those payments to be received in April of 2017. From Aliber's PX 94, it appears the larger size of the last payment is based on the anticipated sale of the hotel in 2017; Aliber projected that sale to net over $130 million.

[18] These same problems exist with respect to the calculation of the profit share for the villas and apartments portion of the development. Although PX 94 and PX 93 present the same numbers, there is no evidence of the basis for those numbers.

## 2. Analysis

The "profit share" components of appellees' damage calculations hinge on the terms of agreements with investors; it must account for the amount of investors' investments, their agreed minimum return on investment, and an agreement as to the division between the developer and the investor(s) of any income received in excess of those amounts. All of these numbers also are unknown because no agreements with investors were executed. Moreover, the "profit share" components of the damage calculations are based, in part, on estimated average occupancy rates and average room rates over a ten or eleven year period, on a hotel that had not been built on property that had not been acquired. And a significant component of those projected damages are based on the future sale of that unbuilt hotel, some eleven years after Aliber's projections were made in PX 94 and at least six years after Goodwin's projections were made in PX 93. Lastly, the evidence regarding the "profit share" components in PX 94 and PX 93 do not take into account the delay in development—admitted to by Goodwin—resulting from the downturn in the Mexican economy.

For these reasons, we conclude the estimates and opinions as to any projected profits from the W Hotel development that would have been shared by JMJ Development Mexico are not based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *See Swinnea*, 318 S.W.3d at 876.

### E. Conclusion

We conclude the evidence concerning the underlying transactions necessary for the development of a W Hotel—even when viewed in the light most favorable to the jury's verdict— does not prove with reasonable certainty that JMJ Development Mexico would ever have completed such a development or on what terms such a development would have been completed; thus, the evidence does not prove the existence or amounts of lost profits with

–19–

reasonable certainty. *See Swinnea*, 318 S.W.3d at 876; *Exel Transp. Servs., Inc., LLC*, 323 S.W.3d at 232. Rather, appellants' projection that they suffered lost-profit damages is "without any evidentiary foundation and therefore, is purely speculative and conclusory." *Szczepanik*, 883 S.W.2d at 650; *Total Clean, L.L.C.*, 330 S.W.3d at 667.

Further, the "opinions or estimates of lost profits" upon which appellees rely are not based on "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Swinnea*, 318 S.W.3d at 876; *Exel Transp. Servs., Inc., LLC*, 323 S.W.3d at 232. Moreover, the calculations and opinions based on those calculations mix purported "profit" numbers with numbers that undisputedly constitute "income." And the calculations do not take into account the expenses involved in earning that income, including (at least as to part of the income) the effect of the thirty percent royalty agreement.

Therefore, we conclude appellees presented no reliable, non-speculative evidence of their lost-profit damages for the W Hotel project.

## IV. THE ST. REGIS HOTEL PROJECT

We next turn to the other transaction that forms the basis for appellees' alleged damages—the development of a St. Regis Hotel project on the Preciado Property.

Appellees presented even less evidence supporting their request for damages associated with the St. Regis Hotel project than they did for the W Hotel. In June 2006, the Garcias obtained a non-binding letter from Starwood Hotels expressing an interest in a St. Regis Hotel on the Preciado Property, if JMJ Development Mexico acquired the property.[19] However, JMJ Development Mexico did not present any evidence as to any discussions, proposals, or letters of intent—much less any binding commitments—concerning this development.

---

[19] Like the letter involving a W Hotel on the Shabshab Property, this letter stated it was only an "expression of our interests to further evaluate these opportunities, and does not create any legally binding obligation on Starwood. You should not rely on this letter . . . ."

JMJ Development Mexico failed to prove with reasonable certainty that it ever would have obtained clear title to the Preciado Property, and on what terms such title would have been obtained; that it would have found investors to fund the project and on what terms those investors would have participated; or that it ever would have obtained an agreement with Starwood to operate a St. Regis Hotel on the Preciado Property, or on what the terms Starwood would have agreed to such an operation. Further, JMJ Development Mexico again assumed that the economic recession would not have impacted its development plans.

Even if we assumed the transaction would have occurred and the St. Regis Hotel would have been built and operated, appellees presented no financial evidence of lost-profits for the St. Regis Hotel project. Rather, Goodwin simply testified that he thought JMJ Development Mexico damages arising from the failure to develop the St. Regis resort were fifty percent of its damages arising from the W Hotel development.[20] Based on this "analysis," Goodwin estimated JMJ Development Mexico sustained $6.5 million in damages—which appears again to be a lost-income calculation, not a lost profits calculation—for the St. Regis Hotel project. Goodwin's estimate also appears to assume JMJ Development Mexico successfully would have secured financing, acquired the property, and received a commitment from Starwood to build a St. Regis Hotel on the Preciado Property, and assumed that the recession would not have mothballed the project for several years. It also appears Goodwin did not consider the effects of the thirty percent royalty agreement with JMJ Development Inc. with respect to at least part of the St. Regis hotel income projections. The evidence in the record does not support these assumptions.

---

[20] Goodwin testified: "So I looked . . . at the proposed W, which is directly adjacent to what was to be the proposed St. Regis, and as a very conservative estimate, I said I think they are damaged at least to the 50-percent level that they would be damaged on the first deal."

Viewing the evidence in the light most favorable to the jury's verdict, we conclude appellees failed to provide any competent evidence showing lost profits for the St. Regis Hotel project. There is no evidence the hotel ever would have been built and Goodwin's "conservative estimate" that JMJ Development Mexico was damaged "at least to the 50-percent level that they would be damaged on the" W Hotel project is not "based on objective facts, figures or data" and does not constitute reasonably certain evidence of lost profits. *See Swinnea*, 318 S.W.3d at 876.

## V. CONCLUSION

Because there was no reliable, non-speculative evidence of appellees' lost profits for either the W Hotel or St. Regis Hotel project, we conclude the jury's findings that JMJ Development Mexico sustained $7 million for lost profits in the past and the Garcias would sustain $3 million for lost profits in the future is not supported by legally sufficient evidence. We sustain appellants' ninth and tenth issues.

We reverse the trial court's judgment awarding damages to appellees for lost profits and render judgment that appellees take nothing on their claim for lost profits. Because we conclude appellees are not entitled to lost profits, appellees have not recovered any damages. We need not address appellants' remaining issues. *See* TEX. R. APP. P. 47.1.


/Jim Moseley/
JIM MOSELEY
JUSTICE

110769F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TIMOTHY BARTON, JMJ
HOSPITALITY, L.L.C. AND JMJ
HOLDINGS, L.L.C, Appellants

No. 05-11-00769-CV          V.

RESORT DEVELOPMENT LATIN
AMERICA, INC., ALIBER GARCIA AND
ELIUD GARCIA, Appellees

On Appeal from the 116th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-07-10870-F.
Opinion delivered by Justice Moseley.
Justices Bridges and Lang participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**REVERSED** and judgment is **RENDERED** that:
Appellees RESORT DEVELOPMENT  LATIN AMERICA, INC., ALIBER
GARCIA, AND ELIUD GARCIA take nothing on their claims against appellants
TIMOTHY BARTON, JMJ HOSPITALITY, L.L.C. AND JMJ HOLDINGS,
L.L.C.

It is **ORDERED** that appellants TIMOTHY BARTON, JMJ HOSPITALITY, L.L.C.
AND JMJ HOLDINGS, L.L.C recover their costs of this appeal from appellees RESORT
DEVELOPMENT LATIN AMERICA, INC., ALIBER GARCIA AND ELIUD GARCIA.


Judgment entered this 21st day of August, 2013.




/Jim Moseley/
JIM MOSELEY
JUSTICE

–23–